John Stanley CAMPBELL,
Plaintiff-Appellant,

v.

H.G. MILLER, et al.,
Defendants-Appellees.

No. 85–1620.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1986.

Decided March 25, 1986.

Rehearing and Rehearing En Banc
Denied May 19, 1986.

218

Howard B. Eisenberg, SIUC School of Law, Carbondale, Ill., for plaintiff-appellant.

Richard H. Lloyd, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendants-appellees.

Before WOOD and RIPPLE, Circuit Judges and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The primary questions presented in this appeal are (1) whether officials[1] of the United States Penitentiary at Marion, Illinois ("Marion"), may impound the plaintiff inmate's commissary account pending his compliance with a restitution order imposed for destroying government property in violation of prison regulations, and (2) whether the combined effect of attorney visitation and law-library use restrictions on the plaintiff, who is housed in the Control Unit at Marion, impermissibly burdens his right of access to counsel and to the courts. The plaintiff brought a *Bivens* action[2] challenging the impoundment of his inmate account and the adequacy of the Control Unit legal access program. The district court entered summary judgment against the plaintiff on the impoundment claim, and, following a trial, entered judgment against him on the access claim. For the reasons stated below, we will affirm.

## I

The plaintiff, John Stanley Campbell, is a federal inmate housed in the Control Unit of Marion. Marion is the highest level maximum security prison in the federal penitentiary system. The Control Unit is designated for those inmates deemed unfit for the general population at Marion because they pose a threat to others or to the orderly operation of the institution. *See, e.g., McCollum v. Miller*, 695 F.2d 1044 (7th Cir.1982); *Garza v. Miller*, 688 F.2d 480 (7th Cir.1982), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983); *Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980).

Campbell, acting *pro se*, brought two civil rights suits, in May of 1982 and January of 1983 respectively, alleging various violations of his constitutional rights arising out of the conditions of his incarceration at Marion, and his treatment by corrections personnel in a number of incidents. In January of 1984, counsel was appointed by the district court to represent Campbell.[3] In February of 1984, Campbell filed an amended complaint alleging four causes of action, only two of which, Counts II and III, are pursued on appeal. In Count II, Campbell alleged that he was deprived of property without due process of law when, as part of disciplinary actions taken against him, his inmate commissary account was impounded pending his compliance with a restitution order. In Count III, Campbell claims that the Control Unit restrictions imposed upon his access to counsel and to legal materials impermissibly burden his right of access. The district court entered

---

**1.** Campbell brought this suit against, *inter alia*, H.G. Miller in his official capacity as warden at Marion. Trial testimony indicates that Jerry Williford is now warden. Pursuant to Fed.R. App.P. 43(c) "[w]hen a public official is a party to an appeal or other proceeding in the court of appeals in his official capacity and during its pendency ... ceases to hold office, the action does not abate and his successor is automatically substituted as a party."

**2.** *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**3.** We are grateful to Howard B. Eisenberg, Associate Professor of Law at Southern Illinois University School of Law, for his able and distinguished representation of Campbell.

summary judgment against Campbell on Count II. Following a trial, the court entered judgment against Campbell on Count III. Campbell appeals from both rulings.

## II

### A. PROCEDURAL DUE PROCESS CLAIM

At an Institution Discipline Committee hearing on October 11, 1982, Campbell confessed to destroying government property in violation of prison regulations. The Discipline Committee ordered Campbell to make restitution in the amount of $1,445.68, and ordered Campbell's inmate commissary account, which contained approximately $60.00, impounded pending Campbell's compliance with the restitution order.

Campbell claims that the impoundment of his inmate account violated his right to procedural due process under the Fifth Amendment. Campbell concedes that Marion officials have authority, under 18 U.S.C. § 4042(3), to discipline federal inmates,[4] and that federal prison regulations allow both for monetary restitution and the loss of commissary privileges as discipli-

nary sanctions for the destruction of government property. 28 C.F.R. § 541.13 (Table 3) (1985). Campbell argues, nonetheless, that prison authorities should have either prosecuted him for damage to government property and obtained an order of restitution under 18 U.S.C. § 3579,[5] or commenced a civil tort action under 28 U.S.C. § 1345.[6] He concludes that "[b]y foregoing the established procedures of either restitution in a criminal case or in a civil action in tort, the [prison authorities] denied [him] his rights to due process of law." We disagree.

It would appear that Campbell is not arguing that the Federal Bureau of Prisons ("Bureau") exceeded its statutory authority in promulgating 28 C.F.R. § 541.13,[7] nor does he argue that the regulation itself is unconstitutional. Moreover, it is unclear whether Campbell argues that it is the combined effect of the restitution and the impoundment orders which violates due process, or whether either order standing alone does so. Because, as we explain below, the disciplinary proceedings prior to the impoundment order afforded Campbell due process, we need not discuss the alter-

---

**4.** 18 U.S.C. § 4042 provides in pertinent part:

> The Bureau of Prisons, under the direction of the Attorney General, shall—
>
> ....
>
> (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States
>
> ....

**5.** 18 U.S.C. § 3579(a)(1) provides in pertinent part:

> The court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of the offense.

**6.** 28 U.S.C. § 1345 provides in pertinent part:

> Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

Campbell has not, however, provided us with a reference supporting the authority of prison officials to sue under this section.

**7.** Before the district court, Campbell argued that "minimal due process standards" had not been observed prior to entry of the restitution and impoundment orders. In his "Memorandum in Objection to [the] Magistrate's Report and Recommendation," Campbell contended that, although a *Wolff*-type hearing" was conducted, "[t]he 'procedure' afforded Plaintiff amounts to no procedure at all. The prison officials must be required to commence some form of summary civil action before depriving a prisoner of his property under 'established state procedure.'"

On appeal, Campbell's argument is confusing, and at points could be read to challenge the statutory authority of the Bureau to promulgate 28 C.F.R. § 541.13 insofar as it provides for monetary restitution as a sanction for conduct violations. We, however, must construe Campbell's due process claim in light of what he argued below. Thus, to the extent that his argument can be read as a challenge to the Bureau's statutory authority, we express no opinion on that issue, for Campbell failed to raise it before the district court. *See City of Chicago v. United States Department of Labor,* 753 F.2d 606, 607 n. 3 (7th Cir.1985); *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir.1984).

native constructions of Campbell's argument.

■ The Fifth Amendment prohibits the federal government from depriving a person of life, liberty, or property without due process of law. The constitutional protections encompassed by the Due Process Clause do not abate at the time of imprisonment. *Hudson v. Palmer*, 468 U.S. 517, ——, 104 S.Ct. 3194, 3206 (1984) (O'Connor, J., concurring). To analyze Campbell's claim, we must determine (1) whether the requirements of due process apply to his inmate account; and (2) if so, what process is due. *See Cleveland Board of Education v. Loudermill*, —— U.S. ——, ——, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Shango v. Jurich*, 681 F.2d 1091 (7th Cir.1982).

■ It is beyond dispute that Campbell has a property interest in the funds on deposit in his prison account. *See, e.g., Quick v. Jones*, 754 F.2d 1521 (9th Cir. 1985); *Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir.1981); *Sell v. Parratt*, 548 F.2d 753, 757 (8th Cir.), *cert. denied*, 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 152 (1977). Yet, Campbell does not argue, nor could he, that the government has caused him to forfeit these funds or to pay them over to it. He complains, rather, that he may no longer use in a particular way property that is his. It is difficult to say whether Campbell's claim, so characterized, implicates a property interest or a liberty interest. In any event, his due process claim must be supported by a protected interest in the use of his commissary account. *Loudermill*, —— U.S. at ——, 105 S.Ct. at 1491; *Shango*, 681 F.2d at 1097.

■ For the purposes of the Due Process Clause, property interests must be found in state or federal law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Shango*, 681 F.2d at 1097. Liberty interests, however, may originate in the Constitution as well. *Hewitt v. Helm*, 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Mathews v. Fairman*, 779 F.2d 409, 412 (7th Cir.1985); *Shango*, 681 F.2d at 1097. Campbell does not point to, nor do we see, a liberty interest arising out of the Constitution itself to support his due process claim. Thus, whatever interest is implicated by Campbell's claim must be created by state or federal law. Because the analysis for property and liberty interests created by state or federal enactments is the same, *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Shango*, 681 F.2d at 1097, the ambiguity in Campbell's argument as to whether he is asserting a property or a liberty interest in the use of his inmate account is inconsequential to the disposition of his claim. Since Campbell is a federal inmate, we confine our inquiry to federal law (here, federal prison regulations) involving inmate commissary accounts.

■ Although a protected interest may be created through the enactment of regulatory measures, *see, e.g., Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975 (good-time credits); *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (parole); *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental institution), the regulation must support a claim of entitlement to the benefit in question.[8] We do not look to the weight or importance of that benefit to the individual,[9] but rather to

---

**8.** *See, e.g., Cleveland Board of Education v. Loudermill*, —— U.S. ——, ——, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430–31, 102 S.Ct. 1148, 1154–55, 71 L.Ed.2d 265 (1982); *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979);

*Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; *Shango v. Jurich*, 681 F.2d 1091, 1097·(1982).

**9.** The Supreme Court has cautioned that "to hold … that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally

the manner in which it was conferred. *Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2103; *Jago v. Van Curen,* 454 U.S. 14, 17, 102 S.Ct. 31, 34, 70 L.Ed.2d 13 (1981). Unless the regulation limits an official's discretion in denying the benefit to "objective and defined" criteria, no protected interest has been created.[10] *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring); *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871; *Mathews,* 779 F.2d at 413; *Achacoso-Sanchez v. INS,* 779 F.2d 1260, 1264–65 (7th Cir.1985). Of course, once it is determined that a protected interest exists, it is no longer the prerogative of the promulgating agency to define the procedures to be followed in protecting that interest; that is a matter of constitutional law. *Loudermill,* —— U.S. at ——, 105 S.Ct. at 1487; *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982); *Vitek,* 445 U.S. at 491, 100 S.Ct. at 1263. Thus, if the federal prison regulations governing inmate discipline and the use of

inmate accounts place substantive limits on the discretion of prison authorities, and hence, give Campbell an entitlement to the use of his commissary account, then the impoundment deprived Campbell of a protected interest.

But we do not have to decide whether federal prison regulations create an entitlement to an inmate's use of his commissary account, because we find that there was no denial of due process in Campbell's case. *See Jackson v. Carlson,* 707 F.2d 943, 947 (7th Cir.), *cert. denied,* 461 U.S. 861, 104 S.Ct. 189, 78 L.Ed.2d 167 (1983). Campbell had precise notice of the charges against him. He was given a hearing before the Institution Discipline Committee, and had a reasonable opportunity to defend himself. He does not allege that his confession to the destruction of the government property was involuntary. He neither claims that the procedures for prison disciplinary proceedings were not followed, nor that they were so lacking in procedural safeguards as to create a substantial doubt as to the determinations reached by the discipline committee.[11] *Mendoza v. Miller,*

have been the business of prison administrators rather than federal courts." *Hewitt v. Helm,* 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (quoting *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)).

**10.** The Supreme Court in *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) (quoting from our opinion in *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982)), emphasized, however, that "'[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality.' Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which an individual has a legitimate claim of entitlement."

**11.** 20 C.F.R. § 541.17 sets forth the procedures to be followed in a hearing before the Institution Discipline Committee. In pertinent part § 541.17 provides:

(a) The Warden shall give an inmate advance written notice of the charge(s) against the inmate no less than 24 hours before the inmate's appearance....

(b) The Warden shall provide an inmate the service of a full time staff member to represent the inmate at the hearing .... The staff representative shall be available to assist the

inmate if the inmate desires by speaking to witnesses and by presenting favorable evidence to the [Institution Discipline Committee] on the merits of the charge(s) .... The [Institution Discipline Committee] shall afford a staff representative adequate time to speak with the inmate and interview requested witnesses where appropriate. While it is expected that a staff member will have had ample time to prepare prior to the hearing, delays in the hearings to allow for adequate preparation may be ordered by the chairman of the Institution Discipline Committee.

(c) The inmate is entitled to make a statement and to present documentary evidence in the inmate's own behalf. An inmate has the right to submit names of requested witnesses and have them called to testify and to present documents in the inmate's behalf, provided the calling of witnesses or the disclosure of the documentary evidence does not jeopardize or threaten institutional or an individual's security .... This may include witnesses from outside of the institution.

....

(f) The [Institution Discipline Committee] shall consider all evidence presented at the hearing and shall make a decision in accordance with the greater weight of the evidence

779 F.2d 1287, 1293 (7th Cir.1985); *Jackson,* 707 F.2d at 948.

The Supreme Court has repeatedly stated that procedural due process is a non-Euclidean concept critically related to time, place and circumstances. *Loudermill,* —— U.S. at ——, 105 S.Ct. at 1495; *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). This is especially true in the context of a correctional institution. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Wolff,* 418 U.S. at 561–62, 94 S.Ct. at 2977; *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *see also Mendoza,* 779 F.2d at 1292–93.

Campbell, in his due process claim, is in effect asking us to restructure routine matters of prison discipline into formal criminal or civil proceedings with the full panoply of rights due a defendant in such proceedings. Such an intrusion on the administration and enforcement of a federal penitentiary's disciplinary regulations is unwarranted and ill-advised. As the Supreme Court recognized in *Wolff:*

> Prison disciplinary proceedings ... take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so.... They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. ... Guards and inmates co-exist in direct and intimate contact. Tension between

them is unremitting. Frustration, resentment, and despair are commonplace.

> It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments.

> [T]here would be great unwisdom in encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution.

*Wolff,* 418 U.S. at 561–63, 94 S.Ct. at 2977–78.

■■■ It is truly too much to require correctional officials to seek a criminal restitution order or a civil tort judgment before they may restrict an inmate's use of his commissary account until he makes good the damage he has caused to prison property.[12] Such a requirement would delay implementation of, and hence, impair the efficacy of prison disciplinary measures. It would significantly increase the cost of prison administration and unduly burden courts with litigation which is essentially administrative in nature. As we recently noted in *Mendoza,* 779 F.2d at 1297:

> Beginning with its decision in *Wolff v. McDonnell,* 418 U.S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974), the Supreme Court has established the minimum requirements of procedural due process to be afforded to prisoners in disciplinary proceedings. Because "[p]rison disciplinary proceedings are not part of a criminal prosecution ... the full panoply of rights due a defendant in such proceed-

---

and one which is supported by substantial evidence manifested in the record of the proceedings ....

(g) The evidence relied upon, the decision, and the reasons for the actions taken must be set out in specific terms unless doing so would jeopardize institutional security.

**12.** Campbell here complains that the process afforded him prior to the restitution order and

to the impoundment of his commissary account was insufficient. *Wolff* involved statutory good-time credits, the revocation of which lengthened the time of an inmate's incarceration. It is obvious that a *Wolff*-hearing, as was conducted in Campbell's case, if sufficient for the revocation of good-time credits, must be so for the entry of the restitution and impoundment orders.

ings does not apply." *Id.* at 556 [94 S.Ct. at 2975].

Absent a showing that the procedural safeguards afforded Campbell at his disciplinary hearing are constitutionally defective, such an act of judicial intervention would be entirely too disruptive of the already strained, and sometimes explosive, correctional environment. As the Supreme Court underscored in *Bell v. Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Because he received an opportunity, under federal prison regulations, to rebut the charges against him, we hold that Campbell was afforded procedural due process consonant with the circumstances of his incarceration.[13] *Garza v. Henderson*, 779 F.2d 390, 396 (7th Cir.1985) (Plaintiff "was accorded full procedural due process … as he received an opportunity to rebut the charges against him."); *Jackson*, 707 F.2d at 948.

## B. ACCESS TO LEGAL COUNSEL AND TO THE COURTS

An attorney may visit Campbell at Marion on Thursdays through Sundays, inclusively, and only after giving twenty-four hours notice. Marion has no established program for providing him with trained legal assistance. Campbell may have only two hardback books, including personal legal volumes, in his cell at any given time. Because he is housed in the Control Unit, Campbell may not directly use the main law library at Marion. He may, however, request up to two specific law books from the main library at a time. Depending upon the demand for a particular volume, Campbell might receive requested materials within twenty-four hours, or he might wait as much as a week. In addition, there is a smaller law library in the Control Unit which Campbell may use directly, though he must submit to a visual body-cavity search, both before entering and upon exiting the library. The unit library does not contain caselaw materials, and because only one inmate may use the library at a time, Campbell has had to wait up to eight days before being allowed access. Campbell contends that the attorney visitation restrictions at Marion, taken together with the other aspects of the Control Unit legal access program, unconstitutionally burden his right of access. We disagree.

 It is beyond dispute that Campbell has a constitutional right of access to counsel and to the courts for pursuing post-conviction remedies and for challenging the conditions of his confinement. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *Wolff*, 418 U.S. at 578–80, 94 S.Ct. at 2985–86 (extends right of access to civil-rights actions); *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974); *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969).[14] Officials at Marion have an affirmative duty to provide constitutionally adequate access,

---

13. As we noted in *McCollum v. Miller*, 695 F.2d at 1048:

> To determine [whether an inmate received due process of law] we must weigh the costs of additional procedural safeguards against the benefits, in reduced errors, which those safeguards would yield, bearing in mind that the benefits are a function both of the probability of error in the absence of a given safeguard and the cost of that error to the person claiming the safeguard.

14. *See also Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.1983) (right of access must be zealously and solicitously safeguarded); *Buise v. Hudkins,* 584 F.2d 223, 228 (7th Cir. 1978) (state bears the burden of demonstrating the adequacy of an inmate's access); *Knell v. Bensinger,* 489 F.2d 1014, 1018 (7th Cir.1973) (inmates must be provided with assistance sufficient to allow them to "challenge their confinement effectively"); *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973) (all other rights of an inmate are illusory without it).

*Bounds,* 430 U.S. at 829, 97 S.Ct. at 1498, and bear the burden of demonstrating the adequacy of the means they choose. *Buise v. Hudkins,* 584 F.2d 223, 228 (7th Cir. 1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

■■■ Campbell's right of access, however, is not unconditional. *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.1983). The constitutionally relevant benchmark is *meaningful,* not total or unlimited access.[15] *Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495; *Wolff,* 418 U.S. at 578–79, 94 S.Ct. at 2986; *Green,* 699 F.2d at 370. In *Bounds,* the Supreme Court framed the inquiry as

> whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.

430 U.S. at 825, 97 S.Ct. at 1496; *see also Johnson v. Brelje,* 701 F.2d 1201, 1208 (7th Cir.1983).

Campbell alleges that the legal access program at the Marion Control Unit is constitutionally inadequate because of the combined effect of (1) the attorney visitation restrictions, (2) the limited direct access to the Control Unit law library, (3) the requirement of a visual body-cavity search before and after using the library, (4) the "exact-cite" paging system for requesting caselaw materials from the main law library, and (5) the lack of an established legal assistance program. We shall consider each of the conditions in turn, and the combined effect thereof, which Campbell contends renders the Control Unit legal access program constitutionally deficient.

(1) Campbell contends that the attorney visitation restrictions, taken together with the other policies he challenges, unreasonably impair his right of access. The Supreme Court has held that "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier,* 416 U.S. at 417, 94 S.Ct. at 1814; *see Johnson v. Brelje,* 701 F.2d at 1207; *Crusoe v. DeRobertis,* 714 F.2d 752 (7th Cir.1983). In *Procunier* the Court acknowledged, nonetheless, that policies restricting an inmate's access to counsel may be justified by security considerations. *Procunier,* 416 U.S. at 412, 94 S.Ct. at 1800. The Court stated:

> The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials.

*Id.* at 420, 94 S.Ct. at 1814–15.

■■■ Such considerations are implicated here. Because security and administrative personnel necessarily must be allocated to accommodate outside visitation, the twenty-four hour notice requirement and the decision to schedule social and legal visitation on the same days comport with the need of prison authorities to know in advance the number of visitors to expect, and to plan for the safe transport of inmates to and from visitation rooms. We acknowledge that the visitation restrictions at Marion may somewhat inconvenience attorneys representing inmate clients.[16] Yet, as the Court in *Procunier* emphasized, prison administrators "are not required to adopt every proposal that may be thought

---

**15.** In *Bounds v. Smith,* 430 U.S. at 825, 97 S.Ct. at 1497, the Supreme Court suggested that an inmate should have sufficient resources at his disposal to allow him to research such issues as jurisdiction, venue, standing, exhaustion of remedies, proper parties plaintiff and defendant, and the types of relief available. More important, an inmate should be able to research "what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."

**16.** Testimony at trial indicated that exceptions sometimes were made to both the twenty-four hour notice requirement and the Thursday through Sunday visitation rule. These exceptions occurred not only in emergency cases, but at least once for the convenience of one of Campbell's attorneys. The record also indicates that both of Campbell's attorneys and the Federal Public Defender were always ultimately able to see their inmate clients.

to facilitate prisoner access to the courts." *Id.* Despite these restrictions, attorneys may visit inmates four days a week. That provides inmates with a reasonable opportunity to receive professional legal assistance. *Id.* at 417, 94 S.Ct. at 1814. We are, thus, chary to find that these policies are unreasonable or unjustified. In the absence of prohibitions far more sweeping than those involved here, we defer to the considered judgment of the Marion correctional officials.[17] *Id.* at 420, 94 S.Ct. at 1814–15; *Bell v. Wolfish,* 441 U.S. at 551, 99 S.Ct. at 1880.

■ (2) Campbell testified that he had experienced delays of up to eight days from the time he requested use of the Control Unit library until being granted permission to do so. He also testified that at other times he had been refused permission to use the library altogether. Here, as with the attorney visitation restrictions, we recognize that the Control Unit procedures are inconvenient. That, however, does not end our inquiry, for if Campbell is afforded meaningful access to the courts despite the delays and inconvenience, then the restrictions are valid. *Bounds,* 430 U.S. at 823, 97 S.Ct. at 1495.

■ Restricting direct access to the Control Unit library does not deprive Campbell of meaningful access to the courts. We agree fully with the conclusion reached by the Ninth Circuit in *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 858 (9th Cir.1985):

[T]he Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials of necessity must regulate the time, manner, and place in which library facilities are used .... The fact that an inmate must wait for a turn to use the library does not necessarily mean that he has been denied meaningful access to the courts.

*See also Walker v. Mintzes,* 771 F.2d 920, 932 (6th Cir.1985); *Twyman v. Crisp,* 584 F.2d 352, 357 (10th Cir.1978); *United States v. Evans,* 542 F.2d 805 (10th Cir. 1976). The Control Unit library is designed to facilitate the initial steps of legal research, *viz.,* the formulation of tentative theories and the notation of materials needed to be consulted. Campbell does not allege that the amount of time he is allowed to spend, either during each visit or in total, is inadequate. Campbell is free to request from the main law library the specific volumes he deems necessary to satisfy his research needs. He may retain such volumes in his cell for at least twenty-four hours.

■ The restrictions on direct access to the Control Unit library stem from legitimate security considerations. As we have noted on numerous occasions in the past, Marion is the only level-six, and hence, the highest level maximum security prison in the federal penitentiary system. *See, e.g., McCollum v. Miller,* 695 F.2d 1044 (7th Cir.1982); *Garza v. Miller,* 688 F.2d 480 (7th Cir.1982), *cert. denied,* 459 U.S. 1150,

---

17. As the Supreme Court acknowledged in *Procunier,* and we underscored in *Crusoe v. DeRobertis,* 714 F.2d 752, 756 (7th Cir.1983):

[T]he problems of prisons in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974).

Although it is the business of correctional officials to maintain order within their institutions, they may not restrict the scope of an inmate's constitutional rights by making automatic and routine assertions of "discipline and security" in the support of restrictive policies. *Cleavinger v. Saxner,* —— U.S. ——, ——, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985); *Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1815; *Morales v. Schmidt,* 489 F.2d 1335, 1342 (7th Cir.1973); *Adams v. Carlson,* 488 F.2d 619 (7th Cir.1973). That is, our deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute.

103 S.Ct. 796, 74 L.Ed.2d 1000 (1983); *Bono v. Saxbe*, 620 F.2d 609 (7th Cir.1980). Only those federal and state prisoners considered exceptional security risks are incarcerated there. *Garza v. Miller*, 688 F.2d at 482. The Control Unit, in which Campbell was housed, is intended for those inmates "who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution." 28 C.F.R. § 541.40(a) (1985). The security status of a prisoner may justify reasonable steps restricting his direct access to legal materials. *Harrington v. Holshouser*, 741 F.2d 66, 69 (4th Cir.1984) (fifteen-day delay in gaining access to law library for inmates in disciplinary segregation is permissible); *Williams v. Leeke*, 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). Because we find that Campbell's access to the courts is not rendered unmeaningful by the direct access restrictions, and that the restrictions implicate legitimate security and disciplinary concerns, we again defer to the judgment of the Marion authorities as to the procedures they have adopted. *Procunier*, 416 U.S. at 420, 94 S.Ct. at 1814–15.

■■■ (3) In the same vein, the requirement that Campbell submit to a visual body-cavity search both before and after using the Control Unit library is justified under the circumstances. We recognize that a body-cavity search is intrusive. Yet, as the Supreme Court noted in *Bell v. Wolfish*, 441 U.S. at 557, 99 S.Ct. at 1884, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." Prison authorities could legitimately fear that the library might become a depository into and out of which contraband could be smuggled. *Id.* at 558–60, 99 S.Ct. at 1884–85. There is, moreover, no reason to think that the body-cavity search requirement has a significantly inhibiting

effect on the motivation of inmates seeking access to legal materials.[18] We find no basis in this record for concluding that Marion officials have "exaggerated their response to these serious problems or that this restriction is irrational." *Id.* at 555, 99 S.Ct. at 1882.

■■■ (4) Campbell argues that the "exact-cite" paging system for Control Unit inmates is "completely unrealistic" and "insufficient." Under that system, Campbell must request caselaw materials from the main law library by exact cite. He may retain only two volumes at a time in his cell, and these for twenty-four hours, though exceptions are made. Again, it is uncontrovertible that the paging system is inconvenient and necessarily causes delay. But again, that does not end our inquiry.

■■■ Campbell indicated that other maximum security prisons either allow inmates held in disciplinary segregation direct access to case law materials, or supplement library facilities with trained legal assistance. Yet, it is simplistic to maintain that the constitutional right of access mandates a "lowest common denominator" security standard, whereby a practice permitted at one penal institution must be permitted at all institutions. *Id.* at 554, 99 S.Ct. at 1882. As we noted above, Marion is the only level-six maximum security institution in the federal penitentiary system, and the Control Unit houses those inmates who are too great a security risk to be allowed in the general population at Marion. The security concerns addressed by the exact-cite paging system are unique, and again we cannot find that Marion officials have exaggerated their response to these concerns or that this restriction is irrational. *Id.* at 555, 99 S.Ct. at 1882.

In *Corgain v. Miller*, 708 F.2d 1241 (7th Cir.1983), we held inadequate the plan then in place at Marion for providing state-boarded inmates access to state caselaw materials. Under that plan, inmates were required to give exact case citations to the

---

**18.** We note that the Fifth Circuit recently upheld the validity of a prison practice requiring inmates classified as security risks to wear leg and waist shackles while using the prison law library. *Tubwell v. Griffith*, 742 F.2d 250, 252 (5th Cir.1984).

desired state materials, which then were photocopied from a library outside of Marion. The inmates did not, however, have access to reference materials from which to derive the citations to the state cases. In the absence of basic reference volumes or trained legal assistance to help the inmates secure the cites to the volumes they needed to complete their legal research, they were caught up in a "Catch-22." *Id.* at 1250. That is not the case with Campbell. He has neither challenged the sufficiency of the reference materials available in the Control Unit library, to which he has direct access, nor alleged that the amount of time he is allowed to spend in the unit library is inadequate to conduct meaningful legal research.[19] Moreover, he does not contend that the caselaw collections in the main law library at Marion are inadequate.

▋▋▋ We again recognize that the exact-cite paging system causes Campbell inconvenience and delays. He has not, however, argued that he has been unable to meet his court deadlines, or that he has had a suit dismissed because of library-related delays. Standing alone, reasonable delay and inconvenience do not rise to the level of a constitutional deficiency. *See, e.g., Garza v. Miller*, 688 F.2d at 487; *Twyman*, 584 F.2d at 357–58; *Bach v. Coughlin*, 508 F.2d 303, 308 (7th Cir.1974). Prison administrators may exercise wide discretion within the bounds of constitutional requirements of meaningful access. *Bounds*, 430

U.S. at 833, 97 S.Ct. at 1500. They need not provide inmates with a library that results in the best possible access to the courts. *Procunier*, 416 U.S. at 420, 94 S.Ct. at 1814; *Lindquist*, 776 F.2d at 856. Inmates in the Control Unit, such as Campbell, cannot be allowed in the main law library intended for general population prisoners.[20] The costs of replicating the entire caselaw collection are prohibitive. In the view of Marion officials, the paging system for Control Unit inmates is warranted by the unique security problems involved. "It is enough to say that they have not been conclusively shown to be wrong in this view." *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

▋▋▋ (5) Finally, Campbell contends that the lack of an established program for trained legal assistance at Marion, taken together with the other restrictions already discussed, deprives him of meaningful access to the courts. Campbell acknowledges that *Bounds* does not entitle him to such a program, provided library access is otherwise constitutionally adequate. *Bounds*, 430 U.S. at 825, 97 S.Ct. at 1496; *Corgain*, 708 F.2d at 1248.[21] An inmate needs legal research or advice in order "to make a meaningful initial presentation [of his claims] to a trial court." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498.[22] Because of our

---

**19.** 28 C.F.R. § 541.46(d) provides in pertinent part:

> *Legal:* An inmate assigned to a control unit may use that unit's inmate basic law library, upon request and in rotation. Consistent with security considerations, the law library is to include basic legal reference books, and ordinarily a table and a chair, typewriter, paper and carbon.

We note that § 451.46(d) became effective after Campbell filed his amended complaint. Yet, it was in effect at the time of his evidentiary hearing, and at all times subsequent thereto. Neither in his briefs on appeal or at oral argument did Campbell allege that this section had not been complied with. We, therefore, assume that the unit library contained basic legal reference books.

**20.** The record discloses that Campbell was transferred to the Control Unit after the Institu-

tion Discipline Committee found him guilty of assaulting and repeatedly stabbing another inmate in the main law library at Marion.

**21.** *See also Lindquist v. Idaho State Board of Corrections*, 776 F.2d 851, 855 (9th Cir.1985); *Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir. 1985); *Penland v. Warren County Jail*, 759 F.2d 524, 531 n. 7 (6th Cir.1985) (en banc); *Cepulonis v. Fair*, 732 F.2d 1, 6 (1st Cir.1984); *Kelsey v. State*, 622 F.2d 956, 957 (8th Cir.1980); *Harrell v. Keohane*, 621 F.2d 1059, 1061 (10th Cir.1980) (per curiam); *Spates v. Manson*, 619 F.2d 204, 208 (2nd Cir.1981).

**22.** We are not unmindful of the fact that Campbell initiated this civil-rights litigation *pro se.* Although counsel subsequently was appointed to represent Campbell before the district court and on appeal, this typically cannot cure a constitutionally defective law library or legal assist-

holding that Campbell has been afforded meaningful access to the law library and legal materials, the lack of trained legal assistance at Marion does not, standing alone or taken together with the restrictions mentioned above, unjustifiably impair his access to the courts.

### III

For the reasons stated above, the summary judgment of the district court against Campbell on the impoundment claim, and the district court's entry of judgment against him on the access claim are

AFFIRMED.

ance program. As the Court in *Bounds* recognized:

> [D]espite the "less stringent standards" by which a *pro se* pleading is judged ... it is often more important that a prisoner complaint set forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing *in forma pauperis* and may dismiss the case if it is deemed frivolous.

*Id.* at 826, 97 S.Ct. at 1497. The Court continued:

> Since our main concern here is "protecting the ability of an inmate to prepare a petition or complaint," *Wolff v. McDonnell,* 418 U.S. at 576, 94 S.Ct. at 2984, it is irrelevant that [a state] authorizes the expenditure of funds for the appointment of counsel in some state post-conviction proceedings for prisoners whose claims survive initial review by the courts.

*Id.* at 828 n. 17, 97 S.Ct. at 1498 n. 17. *Accord Morrow v. Harwell,* 768 F.2d 619, 623 (5th Cir. 1985); *Bonner v. City of Prichard,* 661 F.2d 1206, 1212 (11th Cir.1981) (en banc).