**Billy Joe BROOKS, Plaintiff-Appellant, Cross–Appellee,**

v.

**Alfred E. BUSCHER, D.A. Riegel, Assistant Warden, Stuart Lakin, Joe Scribner, Keith Cole, Jeffrey Kidd, Billy Hewitt, Claude Willis, J.D. Vieregge, and Mike Gitcum, Defendants–Appellees,**

**and**

**Assistant Warden Shields and Garey J. Ahler, Defendants–Appellees, Cross–Appellants.**

Nos. 94–1797, 94–1798.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1995.

Decided July 27, 1995.

James W. Erwin (argued), Gary Mayes, and Bill B. Dorothy, Thompson & Mitchell, St. Louis, MO, for plaintiff.

Terrence T. Rock, Asst. Atty. Gen., Office of the Atty. Gen., Springfield, IL and Daniel N. Malato, Asst. Atty. Gen. (argued), Office of the Atty. Gen. Civ. Appeals Div., Chicago IL, for defendants.

Before CUMMINGS and KANNE, Circuit Judges, and WALTER, District Judge.*

KANNE, Circuit Judge.

Billy Joe Brooks is a prison inmate who wanted to use the prison law library. Because he was a threat to others, prison officials gave him only indirect access to the library. Brooks sued, claiming the limitations on access to the library violated his right of access to the courts. The district court entered judgment in his favor; we reverse.

* The Honorable Donald E. Walter, Judge of the United States District Court for the Western District of Louisiana, sitting by designation.

## I. Background

Billy Joe Brooks is a "circuit rider" in the Illinois prison system.[1] Unlike the old custom of judges riding circuit from town to town to administer justice, Brooks rides his circuit from prison to prison because he is a violent and predatory inmate. Officially known as the Temporary Disciplinary Transfer program, the circuit rider program shuffles among Illinois prisons those inmates who pose threats to prison order, so that they may not put down roots and exercise too much influence at one correctional facility. Typically, circuit riders are gang leaders or inmates who have repeatedly broken the rules and who pose an extreme threat to prison safety and discipline.

Prison officials placed Brooks in the segregation unit at the Vandalia Correctional Center (VCC) from May 18, 1988, to June 8, 1988, exactly three weeks. VCC is a medium security prison; only those prisoners in the segregation unit are considered maximum security inmates. Prisoners in the segregation unit are allowed one hour of exercise and one shower per week and may possess very few items. Brooks amply repaid prison officials' lack of confidence in him. While at VCC, he "was disciplined on a regular basis for throwing food and urine at correctional officers." He also threw a liquid, perhaps urine, on the prison librarian (the person who, as we shall see, was his link to the prison library). He threw food trays and his shoes at the guards. Moreover, Brooks stopped up his toilet and flooded the gallery, so prison officials cut water flow to his cell and restored it only for short periods to allow him to flush and use the wash basin.

After Brooks had thrown urine several times on guards, prison officials decided to remove from his cell the containers he was using to hold the urine. Prison guards put together an extraction team, a group of several shielded and padded guards who wrestle belligerent and uncooperative inmates such as Brooks to the ground and handcuff them. Brooks was extracted from his cell and im-

1. We take our facts from the district court's findings of fact.

mediately transferred to another prison, ending his brief yet eventful stay at VCC.

Brooks, a frequent and accomplished litigator, nearly immediately filed suit against a battery of defendants.[2] He alleged that while he was at VCC, prison officials violated his right of access to the courts, placed him in inhumane conditions and used excessive force amounting to cruel and unusual punishment, and discriminated against him because of his race. The district court, acting through a magistrate judge, held a bench trial on the access to courts claim and the cruel and unusual punishment claim. The district court found for the defendants on the cruel and unusual punishment claim. However, it found that prison officials had denied Brooks his right of access to the courts, but awarded only nominal damages. Brooks appeals from the award of only nominal damages; the defendants cross-appeal from the judgment that they are liable at all.

## II. Analysis

We review the district court's findings of fact for clear error. *Shango v. Jurich*, 965 F.2d 289, 291 (7th Cir.1992). No party disputes the district court's findings of fact, however. We also use the clear error standard for the district court's conclusions that applied law to fact. *United States v. Burns*, 37 F.3d 276, 278 n. 2 (7th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995). Those are the types of questions disputed in this appeal. *See Shango*, 965 F.2d at 291–92. Clear error exists when we "are left with the definite and firm conviction that a mistake has been committed." *Kraushaar v. Flanigan*, 45 F.3d 1040, 1052 (7th Cir.1995).

Prisoners have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977); *Shango*, 965 F.2d at 291; *Hossman v. Spradlin*, 812 F.2d 1019, 1021 (7th Cir.1987). Prisoners must receive "that quantum of access to prison libraries—not total or unlimited access— which will enable them to research the law

and determine what facts may be necessary to state a cause of action." *Hossman*, 812 F.2d at 1021; *see also Campbell v. Miller*, 787 F.2d 217, 226 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Security reasons, however, may justify strict time, place, and manner restrictions. *Shango*, 965 F.2d at 292; *Caldwell v. Miller*, 790 F.2d 589, 606 (7th Cir.1986). Accordingly, inconvenient or highly restrictive regulations may be entirely appropriate and not violate a prisoner's constitutional right of access, as long as the restrictions do not actually completely deny meaningful access to the courts. *Hossman*, 812 F.2d at 1021.

This Circuit uses a two-part test to decide if prison officials violated the right of access to the courts. *Jenkins v. Lane*, 977 F.2d 266, 268 (7th Cir.1992). First, the prisoner must prove that prison officials failed " 'to assist in the preparation and filing of meaningful legal papers.' " *Id.* (quoting *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498). Second, he must show "some quantum of detriment caused by the challenged conduct of state officials." *Jenkins*, 977 F.2d at 268.

Prison officials have two basic options for satisfying a prisoner's right of access. They must provide a prisoner either with access to persons trained in the law (which would include persons such as paralegals and law students), or provide him with adequate access to law libraries. *Bounds*, 430 U.S. at 830–32, 97 S.Ct. at 1499–1500; *DeMallory v. Cullen*, 855 F.2d 442, 446 (7th Cir.1988). "Prison authorities need not provide both of these, but must provide one or the other...." *Id.* Regardless of what method a prison chooses to effectuate the right, a " 'legal access program need not include any particular element ... [but] must be evaluated as a whole to ascertain its compliance with constitutional standards.' " *Corgain v. Miller*, 708 F.2d 1241, 1248 (7th Cir.1983) (quoting *Bounds*, 430 U.S. at 832, 97 S.Ct. at 1500).

Providing inmates with services from persons trained in the law carries inherent prob-

---

**2.** A cursory computer research check turned up 11 documents in which Brooks was the named plaintiff; in one, Brooks won a jury verdict. At

trial Brooks testified he had eight civil cases pending.

lems, such as expense and the necessity for heightened security. Therefore, prisons usually choose to provide prisoners access to law libraries, to allow them to conduct the necessary research largely on their own. For most prisoners, this means they can freely roam law libraries, with various administrative restrictions such as specified hours. But for prisoners like Brooks, who pose a physical danger to other inmates and who may destroy library materials, such a system is not feasible.

To allow access for prisoners who cannot be allowed to use the library directly, prisons frequently set up systems of indirect access for inmates. *See Jenkins,* 977 F.2d at 267; *Shango,* 965 F.2d at 292. They may do this, for while the Constitution requires meaningful access, that does not necessarily mean direct access. *See Shango,* 965 F.2d at 292; *Hossman,* 812 F.2d at 1021; *Campbell,* 787 F.2d at 227. Meaningful access is denied only when a system of indirect access restricts too greatly a prisoner's ability to do basic research, that is, enough to enable him to formulate legal theories and get through the initial stages of a civil suit. *Smith v. Shawnee Library System,* 60 F.3d 317 (7th Cir.1995); *Shango,* 965 F.2d at 292; *Hossman,* 812 F.2d at 1021; *see also Murray v. Giarratano,* 492 U.S. 1, 11, 109 S.Ct. 2765, 2771, 106 L.Ed.2d 1 (1989) ("The Court held in *Bounds* that a prisoner's 'right of access' to the courts required a State to furnish access to adequate law libraries in order that prisoners might prepare petitions for judicial relief."); *Cornett v. Donovan,* 51 F.3d 894, 898–99 (9th Cir.1995) (holding that right of access to the courts "does not require that a state provide assistance beyond the pleading stage."); *Knop v. Johnson,* 977 F.2d 996, 1006–07 (6th Cir.1992) ("[Prisoners] are entitled, rather, to 'access'—which means getting the courthouse door opened in such a way that it will not automatically be slammed shut on them."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993); *Nordgren v. Milliken,* 762 F.2d 851, 855 (10th Cir.) (holding that right of access does not extend beyond "completion of the complaint for a federal habeas or civil rights action"), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

Attuned to these principles, prison officials at VCC set up a system of indirect access for circuit riders in the segregation unit. VCC maintained a law library for all prisoners to use that stocked a full range of legal materials. The law library was run by the law librarian, Garey Ahler, who was trained in library science, but not at all in law. Ahler supervised the inmate law clerks who assisted him. He wrote a forty-page manual to help train them; the manual concentrated on the structure of the law library and use of the facilities, not on giving the inmate clerks a legal education in a nutshell. Basically the inmate law clerks were gofers untutored in the law.

Ahler, a law clerk, and a guard visited Brooks every day he was held at VCC. Prison policy required that Ahler consult every day with each circuit rider who needed help preparing legal materials. The prison refused to allow the law clerks alone to serve the circuit rider inmates, to prevent, as the district court phrased it, "medium security inmates from being placed in a position where they would have to comply with the orders of a more predatory inmate." Ahler therefore served as a buffer and an additional aid to Brooks' research.

The prison, unsurprisingly, forbade Brooks from possessing any books in his cell. Instead, Ahler and the law clerks provided Brooks with photocopies of relevant material upon request. Brooks could request sections of digests or treatises, or of specific cases. The only limitation was that he could not get photocopies of more than 17% of any one book, because of copyright restrictions. Brooks almost always received the photocopies the next day. Before Ahler and the law clerk would deliver the photocopies, a correctional lieutenant would examine it "to determine whether it is suitable for dissemination to the gallery." Additionally, Brooks was not automatically granted whatever he asked for, but Ahler or an inmate law clerk would check it to determine if the request was germane to the topic Brooks was researching. Brooks does not complain that this review led to any instance of his actually being denied relevant material.

The district court found that the indirect "alternative means of access" described above violated Brooks' constitutional rights. While we are mindful of the deference we give such a determination, we nonetheless hold that this conclusion was clearly erroneous.

The district court's conclusion rested primarily on its finding that neither Ahler nor the inmate law clerks, the only people to whom Brooks had access, had any significant legal training. The district court examined Seventh Circuit precedent bearing on the "precise definition of persons trained in the law as required by *Bounds*," and concluded that, however defined, Ahler and the law clerks were not trained in the law, so " 'circuit riders' at Vandalia were required to rely on persons untrained in the law to provide assistance in preparing legal papers."

The district court further supported its conclusion by noting that "It is unquestioned that [circuit rider] inmates did not have direct access to the law library at Vandalia.... In addition, [Brooks'] ability to obtain legal materials was extremely limited. Books, digests and treatises were not allowed directly in the segregation unit. Photocopies were allowed, but again the ability of an inmate to obtain the necessary materials under this system seems quite limited." Thus, the district court concluded that the main constitutional failure of VCC's system was not providing persons trained in law, and inadequate access by prisoners themselves to library material exacerbated that failure.

■ What the district court did not take into account is that access to persons trained in the law and providing access to libraries are each fully independent and sufficient methods of satisfying the right of access to the courts. *Shango*, 965 F.2d at 291; *Campbell*, 787 F.2d at 229–30; *see Knop*, 977 F.2d at 999 (finding abuse of discretion where district court ordered both access to a law library and availability of persons trained in law). It is undisputed that VCC officials gave Brooks no access to persons trained in law. Instead, they gave Brooks access to the law library. That access was through intermediaries: Ahler and the law clerks served essentially as conduits allowing Brooks access to the library at long distance. Their presence was necessary because of the risks Brooks posed, but their presence did not mean that they had to be the "trained legal personnel" which *Bounds* gives as an option for satisfying the right of access. The question instead is whether the intermediaries so constrained Brooks' access to the prison library that he lacked meaningful access to the courts.

We emphasize that if a prison does choose to provide a law library, the function of library assistants is not to act as paralegals or quasi-counsel, as they might have to if the prison provided no law library and instead provided assistants as the requisite "persons trained in law." *See Campbell*, 787 F.2d at 229 (recognizing distinction). Brooks complains that he lacked legal skills and that Ahler and the law clerks were no help to him because they also lacked legal skills. However, the right to access is not the right to a free legal education. Where the prison provides a library, a prisoner such as Brooks may be largely on his own.[3]

■ In light of a correct understanding of the right, we must consider whether the district court's decision that Brooks lacked meaningful access was erroneous. The system of intermediaries that VCC set up obviously obliged Brooks to conduct research

3. We note that Brooks is indisputably able to research on his own. His complaint is that the prison makes his doing so overly difficult, thus constricting his access to the courts. However, not all prisoners are as skilled as Brooks. Where unskilled prisoners are concerned, *Bounds* may require more than simple physical access to legal materials. Instead, prisons may have to provide some minimal aid to prisoners to make their access "meaningful." Prison officials could, for example, provide self-help manuals, designed to aid prisoners in obtaining a basic grasp of legal

research. Brooks, in fact, used just such a self-help manual provided by VCC, as well as prepared forms for § 1983 complaints. Prisons may also rely on inmate writ-writers, to the extent they are able to fill the gap between simple physical access and meaningful access. Or prisons could provide librarians or law clerks who are familiar with the setup of the library and with basic concepts such as the existence of case reporters, digests, and treatises. *See Knop*, 977 F.2d at 1005–07 (discussing these issues).

more slowly. However, the amount and quality of access necessary to satisfy the right must be viewed through the prism of legitimate restrictions, based on security considerations or other important justifications. Prison officials could hardly have done more to give Brooks access to the library; giving books to Brooks or allowing him to visit the library himself would have endangered other prisoners and prison staff. "Prison administrators may exercise wide discretion within the bounds of constitutional requirements of meaningful access." *Campbell*, 787 F.2d at 229 (citing *Bounds*, 430 U.S. at 833, 97 S.Ct. at 1500). Strict limitations are entirely compatible with the Constitution. *Shango*, 965 F.2d at 292; *Hossman*, 812 F.2d at 1021; *Campbell*, 787 F.2d at 228–29. Brooks daily received photocopies of practically any legal material he wanted, including finding aids such as digests and treatises. From those materials he had all the access necessary to formulate basic legal theories and to state a cause of action, allowing him to make his voice heard in the courts. That is all the access he was entitled to receive.[4] The district court's contrary conclusion was erroneous.

Furthermore, the district court gave insufficient weight to legitimate security considerations that helped justify the restrictions. It stated that it did "not understand the requirement that a correctional lieutenant review copies of legal materials before an inmate may receive the requested photocopies." The requirement was clearly designed to prevent the transfer to a dangerous inmate of contraband such as weapons or drugs. *See Caldwell*, 790 F.2d at 609 ("Prison officials are legitimately concerned that hardbound books can be used to [hide] weapons and other contraband."). The district court's discounting of essential security considerations buttresses our finding of clear error.

Brooks was an extreme threat to prison safety and order; that is why prison officials could not give him direct access to the prison library. Instead they gave him access to the library while placing reasonable limitations on his access. The district court erred by concluding that Brooks was further entitled to aid from persons trained in the law, beyond the meaningful access provided through the indirect use of the law library. Therefore, we REVERSE the district court's judgment in favor of Brooks; and Brooks' appeal of the nominal damages award is rendered moot.

---

4. Brooks complains the library failed to stock a copy of the Seventh Circuit Rules. However, he does not claim he needed those Rules for any litigation, merely for his "general education," because he was "trying to get [] to know more about the law." There is no right to legal material for general education, only to that necessary

to have meaningful access to the courts for specific claims. Furthermore, it is an open question whether once a prisoner has been able to make his voice heard in the court of first instance, the right of access extends still further to include library materials for the filing of appeals.