60 F.3d 317
 Thomas W. SMITH, Jr., individually and as representative of
the Class of Inmates in the Protective Custody
Unit at Menard Correctional Center,
Plaintiff-Appellant,
v.
SHAWNEE LIBRARY SYSTEM, et al., Defendants-Appellees.
 Nos. 94-2036, 94-3424.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 29, 1995.
Decided July 14, 1995.
 
 James W. Erwin, Thompson & Mitchell, St. Louis, MO (argued), for Thomas W. Smith, Jr.
 Brian F. Barov, Office of Atty. Gen., Crim. Appeals Div., Chicago, IL (argued), for Shawnee Library System, Walter Brieschke, Debra Givens, Dwayne Kelly, Miles Fletcher, John Roosevelt, James A. Ubel, John Kellerhouse, Michael P. Lane, James Greer, Alan L. Frentzel, James H. Thieret, Ronald L. Fleming, Leanne Pate, Lisa Rea, Ray Quick, Thea Chesley, Marcia Behrens, Rick Sheppard, Correctional Officer Jaimet, Steven Ewell.
 Terence J. Corrigan, Asst. Atty. Gen., Office of Atty. Gen., Crim. Appeals Div., Springfield, IL, Brian F. Barov (argued), Office of Atty. Gen., Crim. Appeals Div., Chicago, IL, for Illinois Dept. of Corrections, Menard Correctional Center.
 Before CUMMINGS and KANNE, Circuit Judges, and WALTER, District Judge.*
 KANNE, Circuit Judge.
 
 
 1
 Thomas Smith, an Illinois state prison inmate, claims he and other inmates in protective custody were denied meaningful access to the courts. We hold that the prison did not deny Smith meaningful access, but we also hold that the class action status of the litigation is void.
 
 I. Background
 
 2
 From 1980 to 1992, Smith was a prisoner at Menard Correctional Center (MCC), a maximum security state prison in Menard, Illinois. Prison officials placed Smith in the protective custody unit (PCU), where prisoners were segregated from the general population for their own protection. The prison established the PCU pursuant to a federal court consent decree (unrelated to this litigation), into which it entered in 1981.
 
 
 3
 MCC maintained a fully stocked law library for prisoners to use. The law library was available to general population inmates five days a week for six hours a day. Up to twenty-five inmates at a time could browse freely. However, because inmates in the PCU could not safely mix with general population inmates, MCC constructed five wire mesh cells inside a room attached to the library. PCU inmates using the library were locked in those cells, and legal materials were delivered to them through a slot in the wire mesh.
 
 
 4
 PCU inmates could therefore not browse in the library; instead, non-inmate law librarians, as well as trained inmate law clerks, provided research and document preparation assistance to them. This assistance included bringing them books they wanted, both case reporters and finding aids such as law digests. PCU inmates could have as many books as they wanted in their library cells at one time. The library also maintained a "missing case file," updated twice a week, containing photocopies of cases inmates had torn out of case reporters.
 
 
 5
 A PCU inmate who wanted to use the library could either notify prison staff, notify inmate law clerks, or place a note in a special box by the PCU cellhouse door. PCU inmates had access to the library five days a week for approximately three hours a day, although the exact hours varied slightly. Mondays, Wednesdays, and Fridays were reserved for PCU inmates with court deadlines, while Tuesdays and Thursdays were reserved for PCU inmates without immediately pressing legal business. In addition to using the library cells, PCU inmates could get photocopies and notaries brought to their own cells in the PCU cellhouse.
 
 
 6
 Smith is an accomplished "jailhouse lawyer," although professional counsel has represented him for almost all of this litigation. From the time he entered the prison system until 1991, Smith had filed 97 lawsuits, and he routinely assisted other inmates in research and case preparation.
 
 
 7
 On June 5, 1985, Smith filed a suit under 42 U.S.C. Sec. 1983 against various defendants connected with the prison, alleging that they had infringed his right of access to the courts. The case crawled along; Smith added more defendants and more factual allegations, and asked that the case be certified as a class action, with himself as class representative. On September 11, 1989, a magistrate judge certified the case as a class action and granted a preliminary injunction. The preliminary injunction required that PCU inmates get ten hours per week of unlimited access to the library.[1]
 
 
 8
 On March 30, 1994, a magistrate judge granted summary judgment for all the private defendants, and, on September 26, 1994, he dismissed the case against the state defendants--MCC and the Illinois Department of Corrections. Smith appeals only the summary judgment in favor of the individual defendants.
 
 II. Analysis
 
 9
 We review a district court's grant of summary judgment de novo. Hedberg v. Indiana Bell, 47 F.3d 928, 931 (7th Cir.1995). We draw all reasonable inferences in favor of the nonmoving party. Id. A district court must grant summary judgment where the record before it shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party opposing a motion for summary judgment may not rest on the allegations in his pleadings; instead, he must come forward with evidence of a genuine factual dispute. Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1302 (7th Cir.1991). Conclusory allegations by the party opposing the motion cannot defeat the motion. Hedberg, 47 F.3d at 931; First Commodity Traders v. Heinold Commodities, 766 F.2d 1007, 1011 (7th Cir.1985).
 
 A. Appellate Jurisdiction
 
 10
 United States magistrate judges have overseen this case from its very early stages. For a magistrate judge to have the power to enter a final judgment, each party to litigation must explicitly consent. 28 U.S.C. Sec. 636(c); Mark I, Inc. v. Gruber, 38 F.3d 369, 370 (7th Cir.1994). If the parties do not so consent, the magistrate judge's decision is a recommendation reviewable by the district court only, and the Court of Appeals lacks jurisdiction over an appeal. Jaliwala v. United States, 945 F.2d 221, 223 (7th Cir.1991).
 
 
 11
 The original parties to this litigation jumped through the required hoops. On May 5, 1988, all defendants named at the time executed a written consent. On May 17, 1988, Smith executed a consent. However, Smith added eight more defendants in his Third Amended Complaint, filed April 6, 1990. Those defendants did not consent at the time, though they were represented by the same attorneys from the State of Illinois. Nonetheless, the case proceeded.
 
 
 12
 After oral argument, Smith brought the eight defendants' lack of consent to this Court's attention. We ordered a response from the defendants, who offered to cure the problem by submitting a belated consent through their attorneys (except for the one defendant who had died in the meantime--shades of Bleak House ). We must decide what effect, if any, this tangle of consents has on our appellate jurisdiction.
 
 
 13
 If the seven additional defendants had not submitted a belated consent, that would be the end of it. See Jaliwala, 945 F.2d at 224 (dismissing appeal because intervening defendant never consented to magistrate judge's entry of final judgment). However, in King v. Ionization Int'l, 825 F.2d 1180, 1185 (7th Cir.1987), we held that the parties could show that they had consented by submitting a stipulation well after the magistrate judge's entry of judgment. Moreover, in Mark I, 38 F.3d at 371, we addressed the flip side of the problem, where the non-consenting defendant refused to consent later. A defendant had been added after the initial consents were given, and the magistrate judge found against him at trial. After oral argument before this Court, the defendant refused his "belated opportunity to make his wishes known," declining to indicate his consent. We therefore refused to hear the appeal, id. at 371.
 
 
 14
 King controls the case before us as well. "The statute does not require a specific form or time of consent...." King, 825 F.2d at 1185. A late-submitted consent is "an unequivocal representation that the magistrate was acting with the parties' consent." Id. We must accept the seven defendants' consent, and we therefore have jurisdiction over this appeal. See also Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc., 53 F.3d 851 (7th Cir.1995) (discussing necessity of consent).
 
 
 15
 The problem with accepting late consents, as Smith points out, is that it allows parties to play strategy games. If a litigant knows that he or someone aligned on his side has not consented, he can keep silent, and grant his consent if the magistrate judge decides in his favor, but withhold his consent and get another crack at the pinata if the magistrate judge decides against him. See Caprera v. Jacobs, 790 F.2d 442, 445 (5th Cir.1986). Of course, if we did not accept late consents, a litigant who knew that the other side had not consented could wait until judgment and raise the problem only if he lost. Rather than write a treatise on game theory, however, we simply note that King controls.
 
 B. Class Notification
 
 16
 The magistrate judge first certified this case as a class action on September 11, 1989, under Fed.R.Civ.P. 23(b)(2). Rule 23(b)(2) class actions generally ask only for declaratory or injunctive relief. Fontana v. Elrod, 826 F.2d 729, 732 (7th Cir.1987); Williams v. Lane, 129 F.R.D. 636, 639-41 (N.D.Ill.1990). The court has discretion whether to notify class members of such a Rule 23(b)(2) class action. Fontana, 826 F.2d at 732; see Kyriazi v. Western Elec. Co., 647 F.2d 388, 393 (3d Cir.1981).
 
 
 17
 Class actions under Rule 23(b)(3) allow class members to recover damages. However, members of a Rule 23(b)(3) class must receive reasonable notice and an opportunity to opt out; that is an absolute requirement for a court to exercise jurisdiction over those class members. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974); Gert v. Elgin Nat'l Indus., Inc., 773 F.2d 154, 159-60 (7th Cir.1985); see also Williams v. Burlington Northern, Inc., 832 F.2d 100, 103 (7th Cir.1987) (discussing notice requirement), cert. denied, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988).
 
 
 18
 On July 15, 1991, the magistrate judge amended his earlier certification in a two-line order at Smith's request, adding "certification under Rule 23(b)(3)" as well as the new claim for money damages. The intended effect was unclear, but, in the context, the judge's language implied that he was substituting certification under Rule 23(b)(3) for certification under Rule 23(b)(2). He was apparently not creating a type of hybrid class action or creating sub-classes, see Kyriazi, 647 F.2d at 393-95; he never mentioned the possibility of such schemes, although Smith did.[2]
 
 
 19
 Smith thereupon made various motions to notify the class, and the defendants resisted each motion. The magistrate judge found no fault with the notification demands, but the class notification proceeded at a glacial pace. As a result, summary judgment was granted before notification was made, and therefore the court dismissed Smith's requests for notification as moot. They were moot, of course, but the class certification was void because no notice was ever given to the absent members of Smith's class. Therefore, insofar as the magistrate judge's order purports to rule against the entire class, it is in error. See Gert, 773 F.2d at 160.
 
 C. Access to Courts
 
 20
 Smith claims that the system of library use MCC set up for PCU inmates violated his constitutional right of "meaningful" access to the courts. See Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (discussing right of meaningful access).[3] The right of access allows prisoners to raise their voices in the courts; otherwise they would be at the whim of prison officials. DeMallory v. Cullen, 855 F.2d 442, 446 (7th Cir.1988). To satisfy the right to meaningful access, prisoners must receive "that quantum of access to prison libraries--not total or unlimited access--which will enable them to research the law and determine what facts may be necessary to state a cause of action." Hossman v. Spradlin, 812 F.2d 1019, 1021 (7th Cir.1987); see Campbell v. Miller, 787 F.2d 217, 226 (7th Cir.), cert. denied, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Prisoners must be given either access to trained legal personnel or adequate access to law libraries. Bounds, 430 U.S. at 828, 97 S.Ct. at 1498; DeMallory, 855 F.2d at 446. MCC chose the latter route.
 
 
 21
 At least in civil cases such as Sec. 1983 suits, the right to access is meant to allow a prisoner to bring claims through the preliminary stages in the courts, not to allow full-fledged self-representation. "[O]ur main concern here is protecting the ability of an inmate to prepare a petition or complaint." Bounds, 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17. "An inmate needs legal research or advice in order 'to make a meaningful initial presentation [of his claims] to a trial court.' " Campbell, 787 F.2d at 229, quoting Bounds, 430 U.S. at 828, 97 S.Ct. at 1498. The crucial function of the right of access is to enable "a prisoner complaint [to] set forth a nonfrivolous claim meeting all procedural prerequisites, since the court may pass on the complaint's sufficiency before allowing filing in forma pauperis and may dismiss the case if it is deemed frivolous." Id., 430 U.S. at 826, 97 S.Ct. at 1497. See Murray v. Giarratano, 492 U.S. 1, 11, 109 S.Ct. 2765, 2771, 106 L.Ed.2d 1 (1989) ("The Court held in Bounds that a prisoner's 'right of access' to the courts required a State to furnish access to adequate law libraries in order that the prisoner might prepare petitions for judicial relief."); Cornett v. Donovan, 51 F.3d 894, 898-99 (9th Cir.1995) (holding that right of access to the courts "does not require that a state provide assistance beyond the pleading stage."); Nordgren v. Milliken, 762 F.2d 851, 855 (10th Cir.) (holding that right of access does not extend beyond "completion of the complaint for a federal habeas or civil rights action"), cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985); Corgain v. Miller, 708 F.2d 1241, 1250 (7th Cir.1983) (rejecting argument that right to proceed pro se itself requires access to prison law libraries).
 
 
 22
 When a prisoner is able to make his voice heard in the courts through the right of access, preserving his claims and beginning the litigation process, he can then proceed to hire a lawyer, find one on contingency, or he can ask that counsel be appointed for him. See Billman v. Indiana Dept. of Corr., 56 F.3d 785, 789 (7th Cir.1995); Farmer v. Haas, 990 F.2d 319, 321-22 (7th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993). In fact, Smith did exactly that: very early in the litigation he submitted a pro se petition asking for appointed counsel, and the magistrate judge granted it, after which appointed counsel, aided by Smith, pursued the case. Nonetheless, Smith maintains he was denied his right to meaningful access.
 
 
 23
 Deciding whether a penal system provides adequate access means evaluating a legal access program as a whole, rather than requiring it to contain any particular service. Bounds, 430 U.S. at 832, 97 S.Ct. at 1500; Shango v. Jurich, 965 F.2d 289, 291 (7th Cir.1992). There is no "right to browse"; prison inmates are not constitutionally entitled to unfettered direct access to law libraries. Prisoners are instead entitled to "meaningful" access to the courts. Hossman, 812 F.2d at 1021; Campbell, 787 F.2d 217 at 226. "[W]here 'meaningful' access to the courts is not denied as the result of inconvenient or even highly restrictive regulations governing the use of a prison law library, no constitutional guarantee to court access is violated." Hossman, 812 F.2d at 1021. Moreover, prison security is an important and legitimate consideration when setting regulations for access to prison libraries. Shango, 965 F.2d at 292; Campbell, 787 F.2d at 227-28; see also Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").
 
 
 24
 To show a violation of the right of access to the courts, Smith must meet both parts of a two-part test. Jenkins v. Lane, 977 F.2d 266, 268 (7th Cir.1992). First, he must prove that prison officials failed " 'to assist in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.' " Id. (quoting Bounds, 430 U.S. at 828, 97 S.Ct. at 1498). Second, Smith must show "some quantum of detriment caused by the challenged conduct of state officials." Jenkins, 977 F.2d at 268 (quoting Shango, 965 F.2d at 292).
 
 
 25
 In Shango, 965 F.2d at 291-94, we upheld a district court decision finding constitutional a system of library use for PCU inmates at the Stateville, Illinois prison. The Stateville law library was open during the day on weekdays. PCU inmates could visit the library for "about three hours every third to fifth weekday," but they were each locked in one of seven cells. Trained inmate legal clerks would bring legal materials to the cells. Lockdowns, meals, and other prison activities often precluded PCU inmates from using the cells. Shango, 965 F.2d at 292. We concluded that, even though the Stateville system was perhaps "an impingement" on free access to legal materials, the system was nonetheless constitutional. Id. at 293. Shango is factually indistinguishable from the case before us, as Smith implicitly admits by refusing to try to distinguish it, despite his opponents' heavy reliance on it.[4]
 
 
 26
 As in Shango, Smith and the other PCU inmates at MCC had meaningful access to law research materials. Trained non-inmate librarians and inmate law clerks assisted the PCU inmates at MCC. The inmates could obtain any material they needed or wanted from the library, including digests, treatises, and a full range of case reporters. The hours Smith says PCU inmates could use the library were constitutionally adequate. In fact, Smith does not really argue much that the hours were insufficient; he concentrates on the physical limitations and inconveniences the system of separate cells imposed. However, in Campbell, 787 F.2d at 225, we upheld a judgment against inmates on an access to the courts claim, where prisoners had no access to trained legal assistants, could request only two books at a time, had to give exact citations for requested cases, had to submit to body cavity searches, and had to wait up to eight days before being allowed any access to the library. In light of this Court's persuasive precedent, Smith fights an uphill and losing battle.
 
 
 27
 Naturally, sitting locked in a cell is less pleasant than getting the free run of the library (though not as unpleasant as being attacked by general population inmates while in the library), and the segregation may have slowed legal preparation. Smith agrees it did not stop legal preparation, and we have held that even highly restrictive regulations can be completely compatible with meaningful access. Hossman, 812 F.2d at 1021. The system for PCU inmates was not restrictive enough to amount to a constitutional violation. The inconveniences of which Smith complains (assuming that his allegations are true), such as having to wait for the missing case file, lack of library access during lockdowns and similar emergencies (e.g., library guards on some days being assigned to other pressing needs), and sometimes-uncooperative inmate law clerks, simply do not rise to the level of a denial of meaningful access.[5] See Shango, 965 F.2d at 292-93; Campbell, 787 F.2d at 227-28. Moreover, and importantly, legitimate security reasons underlie the library cells system. PCU inmates had been physically attacked and were constantly harassed by threats of more attacks. The prison had a duty to provide security for the PCU inmates, and the library cell system was a plausible and constitutional method. As long as a system of library use provides meaningful access, other possible systems, such as providing special weekend or night hours, are not constitutionally required.[6]
 
 
 28
 Smith emphasizes that PCU inmates locked in cells who wished to use the toilet were escorted out and not allowed to return to the library that day. MCC instituted this policy to minimize PCU inmate contact with the general population when a PCU inmate used the library toilet and was attacked by other inmates. To allow PCU inmates to urinate, the librarians placed cans in the cells (after some inmates had relieved themselves directly on the floor of the cells). Smith calls this practice cruel. While unpleasant, and perhaps not the best solution, this is not an Eighth Amendment case, and prisoners still had just as much opportunity for meaningful access. See Campbell, 787 F.2d at 228 (upholding mandatory body cavity search before and after library use as "not significantly inhibiting" access to legal materials).
 
 
 29
 Smith failed to meet his burden of coming forward with adequate evidence to support the existence of a genuine issue of material fact.[7] The system, as Smith's evidence describes it, provided meaningful access to the courts. Minor disputes of fact, such as the exact hours of library operation, doubtless still exist, but none are material on the record before us. Therefore, because the record before the district court showed that as a matter of law Smith and the other PCU inmates had meaningful access, the district court did not err by granting summary judgment.[8]
 
 
 30
 We MODIFY the district court's order to the extent it purports to apply to members of the class other than Smith. We AFFIRM the order as modified.[9]
 
 
 
 *
 The Honorable Donald E. Walter, Judge of the United States District Court for the Western District of Louisiana, sitting by designation
 
 
 [1]
 Around the time of the injunction, MCC eliminated the in-library cells and began providing night hours for PCU inmates to browse in the library. The preliminary injunction was dissolved upon the entry of summary judgment for defendants in this case, and the record does not indicate the current structure for library use by PCU inmates. Smith does argue, somewhat desultorily, that the new system also infringed his rights and was not in keeping with the preliminary injunction. He did not bring an action under the injunction, however. Our opinion today concentrates on the more restrictive pre-1989 library system, but our holding that Smith was not denied adequate access applies to the system at all times relevant to the litigation
 
 
 [2]
 The magistrate judge might have certified the part of the suit asking for equitable relief under Rule 23(b)(2) and certified the part of the suit asking for monetary relief under Rule 23(b)(3). Class members would still have been entitled to notice as to the monetary relief portions of the suit. We think that if a complexity such as a hybrid class action is to be created, it must be clear on the record that the district court intends that effect
 
 
 [3]
 It is not entirely clear whether the right to access is based upon due process or equal protection guarantees. See Murray v. Giarratano, 492 U.S. 1, 11 n. 6, 109 S.Ct. 2765, 2771 n. 6, 106 L.Ed.2d 1 (1989) (recognizing question as open)
 
 
 [4]
 Shango was not an appeal from a summary judgment, but from a verdict against the inmates. Because of the different standards of review, Shango does not dictate the result we reach today, but it is persuasive
 
 
 [5]
 Smith stated that some of the inmate law clerks were corrupt and incompetent, but he also stated that therefore he insisted that the librarians, not the law clerks, provide almost all of his services. Smith stated that he once could not immediately get notary services, but he admitted that he failed to pursue known avenues for getting notary service; instead, he "just stopped." He also says he had "difficulty" getting typing paper, but admits he was able to get paper when needed. Smith concludes that even though he could get what he needed, the fact that it was not as easy as it might have been denied him meaningful access. These arguments create no genuine issue of material fact; they are just the sort of conclusory allegations summary judgment is designed to defeat, as is his argument that he had an "overall inability to conduct legal research."
 
 
 [6]
 Smith points us to DeMallory v. Cullen, 855 F.2d 442 (7th Cir.1988) and Williams v. Lane, 851 F.2d 867 (7th Cir.1988). Neither case supports his arguments. DeMallory involved much more severe restrictions: the plaintiff inmate had been in segregation for ten years, and, for example, could only research through written correspondence with untrained inmate paralegals. And Williams involved a different standard of review than we apply today, as we already noted in Shango, 965 F.2d at 294 (distinguishing Williams on a number of grounds)
 
 
 [7]
 Smith cites in places to material not before the district court, such as part of a 1991 deposition. He may not, of course, rely on such evidence in his appeal to this court. Henn v. Nat'l Geographic Soc'y, 819 F.2d 824, 831 (7th Cir.), cert. denied, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). We therefore ignore his arguments based on material not in the record, although it would make no difference in the outcome of the case
 
 
 [8]
 As the district court also held, Smith additionally fails the second part of the meaningful access test, that he must have suffered some real detriment. Kincaid v. Vail, 969 F.2d 594, 603 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1002, 122 L.Ed.2d 152 (1993). Smith says that as a result of the system he had to file a brief before this Court (in another case) without citing any case law, but he admits he did not even ask for an extension that very likely would have been granted. He claims he had to delay many pieces of litigation, but he provides no evidence (and he admits he has been able to file nearly 100 cases). Smith notes that in 1982 the Illinois Court of Claims filing was returned for lack of notarization, yet instead of going through the processes he admits existed for notarization, he simply "gave up." However, we see no reason to expand on this failure to show any detriment, given our holding that Smith fails the first part of the test
 
 
 [9]
 Our primary holding upholds the summary judgment on a different ground than that relied upon by the district court. Mendelovitz v. Vosicky, 40 F.3d 182, 187 (7th Cir.1994)