**ELI LILLY AND COMPANY,**
Plaintiff,

v.

**AMERICAN CYANAMID COMPANY,**
**Teva Pharmaceuticals, Inc., Zenith**
**Laboratories, Inc., Biochimica Opos,**
**S.p.A., Roussel Corporation, Roussel**
**UCLAF, S.A. and Rugby Laboratories,**
**Inc., Defendants.**

No. IP 95–536–C–B/S.

United States District Court,
S.D.Indiana,
Indianapolis Division.

June 14, 1999.

Stephen E. Arthur, Steers Sullivan, Indianapolis, IN, Robert L. Baechtold, Fitzpatrick Cella Harper & Scinto, New York City, James Galbraith, Kenyon & Kenyon, New York City, Marc S. Gross, Darby & Dabry, New York City, William L. Mentlik, Lerner David Littenberg Krumholz & Mentlik, Westfield, NJ, William C. Potter II, Price Potter & Mellowitz, Indianapolis, IN, Henry J. Price, Price Potter & Mellowitz, Indianapolis, IN, Hugh E. Reynolds, Locke Reynolds Boyd & Weisell, Indianapolis, IN, Hugh E. Reynolds Jr., Locke Reynolds Boyd & Weisell, Indianapolis, IN, Jay B. Shapiro, Stearns Weaver Miller Weissler, Alhadeff & Sitterson, Miami, FL, Jay G. Taylor, Ice Miller Donadio & Ryan, Indianapolis, IN, Scott Zarin, Darby & Darby, New York City, for defendants.

## ENTRY GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BARKER, Chief Judge.

This matter comes before the Court on Defendants' motion for partial summary judgment as to Plaintiff's claim for patent infringement of Plaintiff's Shionogi patents and Defendants' counterclaim seeking a declaratory judgment of noninfringement. Defendants assert that there is no genuine issue of material fact that the intermediate compound at issue, compound 6, is "materially changed" when converted to cefaclor, the product of Plaintiff's process patents, and thus Plaintiff cannot succeed on its infringement claim under 35 U.S.C. § 271(g). For the reasons discussed below, we *grant* Defendants' motion for partial summary judgment.[1]

### BACKGROUND [2]

This is a patent infringement claim in connection with the manufacture, importa-

Paul H. Berghoff, McDonnell, Boehnen, Hulbert & Berghoff, Chicago, IL, John R Schaibley III, Baker & Daniels, Indianapolis, IN, Thomas G. Slater Jr, Hunton & Williams, Richmond, VA, Paul F. Ware Jr., Goodwin Proctor & Hoar Llp, Boston, MA, for plaintiff.

1. Defendants request oral argument on their motion for partial summary judgment. However, the Court finds the parties' briefing sufficient for determination of this matter and oral argument unnecessary, and accordingly we *deny* Defendants' request.

2. The facts of this case have been set forth in great detail in the Court's previous opinion,

tion and sale of a pharmaceutical known as cefaclor. Plaintiff, Eli Lilly and Company ("Lilly"), owns U.S.Patents No. 4,160,085 and No. 4,346,218 (the "Shionogi patents") relating to a method for synthesizing antibiotics, including cefaclor. Cefaclor is the generic name of a popular broad-spectrum antibiotic sold by Lilly under the branded name Ceclor®. Lilly asserts that Defendants American Cyanamid Company ("American Cyanamid"), Biocraft Laboratories, Inc. n/k/a Teva Pharmaceuticals, Inc. ("Teva"), Zenith Laboratories, Inc. ("Zenith"), Biochimica Opos, S.p.A. ("Opos"), Roussel Corporation ("Roussel Corp."), Roussel UCLAF, S.A. ("Roussel UCLAF") and Rugby Laboratories, Inc. ("Rugby") infringed Lilly's Shionogi patents.

Plaintiff Lilly is an Indiana corporation engaged in the business of researching, developing, manufacturing and selling prescription pharmaceutical products. Defendant American Cyanamid, a subsidiary of American Home Products Corporation, markets generic pharmaceutical products through its Lederle division. Defendants Zenith and Teva are also in the business of manufacturing and marketing generic pharmaceutical products. Defendant Opos is organized under the laws of the country of Italy. Opos is a wholly owned subsidiary of Roussel UCLAF and is in the business of manufacturing pharmaceutical products for generic drug companies. Defendant Roussel Corp. is a corporation incorporated in Delaware with its principal place of business in Montvale, New Jersey. Defendant Roussel UCLAF is a French corporation that wholly owns and controls Opos and Roussel Corp. Defendant Rugby is a corporation incorporated in Delaware with its principal place of business in West Hempstead, New York. Lilly's patent on cefaclor expired on December 9, 1992, long before this lawsuit was filed on April 27, 1995, and the Shionogi process patents expired on July 3, 1996. Before the expiration of the Shionogi patents, American Cyanamid, Teva and Zenith purchased bulk cefaclor in the United States through Roussel Corp., which in turn obtained bulk cefaclor from Opos in Italy.

The Process Patent Amendments Act of 1988 provides protection to United States process patent holders against products made abroad by a process patented in the United States. Title 35 U.S.C. § 271(g) provides in pertinent part, "Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.... A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—(1) it is materially changed by subsequent processes...."

The precise details of the manufacturing process Opos used in producing the allegedly infringing imported bulk cefaclor are now in dispute but for purposes of this motion, the parties agree that Opos manufactures cefaclor in a nine-step process, beginning with a starting material called "compound 1" and continuing through eight distinct intermediates and producing a final end product called "compound 10," which is cefaclor. The focus of this motion and Lilly's infringement claim is step 5 of the Opos process, in which compound 5 is converted into compound 6. Step 5 is claimed in Lilly's Shionogi patents. The issue before the Court is whether compound 6 is "materially changed by subsequent processes" when converted into cefaclor so as to preclude liability against Defendants for infringement of Lilly's patents.

Four years ago, Lilly moved for a preliminary injunction on this issue and we held a three-day evidentiary hearing. On August 3, 1995, we denied Lilly's motion,

---

*Eli Lilly and Co. v. American Cyanamid Co.,* 896 F.Supp. 851 (S.D.Ind.1995), and the Federal Circuit's opinion affirming our decision, 82 F.3d 1568 (Fed.Cir.1996), and we incorporate those statements of fact into this opinion.

finding that Lilly had not shown a likelihood of success on the merits. *See Eli Lilly and Co. v. American Cyanamid Co.,* 896 F.Supp. 851 (S.D.Ind.1995) (*Lilly I*). On May 10, 1996, the Federal Circuit affirmed our denial of Lilly's preliminary injunction motion and affirmed our holding that Lilly had not shown likelihood of success on the merits. *See Eli Lilly and Co. v. American Cyanamid Co.,* 82 F.3d 1568 (Fed.Cir.1996) (*Lilly II*). Both this Court and the Federal Circuit found, based on the stipulated facts, that compound 6 is materially changed when converted into cefaclor. Having enjoyed success at the preliminary injunction level, Defendants now move for partial summary judgment on this issue, asserting that the relevant facts the same as the facts stipulated to during the course of litigating the preliminary injunction motion and that these facts compel a finding of noninfringement. Lilly opposes Defendants' motion, asserting that it stipulated to certain facts for purposes of the preliminary injunction motion only and that further discovery and factual development have brought to light new facts which preclude the entry of summary judgment that were not considered in the trial court and appellate court's rulings.

Specifically, Lilly stipulated that compound 6 did not have useful antibiotic activity for purposes of the preliminary injunction proceedings, which fact, Lilly contends, was an important part of the courts' earlier findings relating to the material change issue. After losing its motion for preliminary injunction, Lilly conducted laboratory experiments on compound 6 to determine whether it in fact exhibited meaningful antibiotic activity so as to diminish the differences between compound 6 and cefaclor as found by the district court and the Federal Circuit. Lilly argues that the results of its testing show that compound 6 has significant antibiotic activity, permitting a fact finder reasonably to conclude that compound 6 is not materially changed when converted to cefaclor and thus foreclosing summary judgment in favor of Defendants on this issue. Lilly also argues that even if there are significant differences between compound 6 and cefaclor, that such differences do not constitute a material change so as to exempt Defendants from liability for infringement under § 271(g) because Defendants fail the second phase of the material change test, which involves whether there is a commercially viable alternative method for producing cefaclor.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med. Center v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Greenslade v. Chicago Sun–Times, Inc.,* 112 F.3d 853, 857 (7th Cir.1997). In considering a summary judgment motion, a court must draw all justifiable inferences in a light most favorable to the opposing party and must resolve any doubt against the moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992).

While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the nonmoving party may not sim-

ply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1302 (7th Cir.1991). Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion. *See Smith v. Shawnee Library System*, 60 F.3d 317, 320 (7th Cir.1995). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. However, if doubts remain as to the existence of a material fact, those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

### DISCUSSION

■ Defendants rely upon the findings of this Court and the Federal Circuit with respect to the material change issue. In our opinion denying Lilly's motion for a preliminary injunction in *Lilly I*, we identified the differences between compound 6 and cefaclor as follows:

> [T]he differences between compound 6 and cefaclor are manifest. Once compound 6 is created, it must be subjected to four fairly complex process steps in order to convert it into cefaclor. Initially, the hydroxy group is removed from the 3–position and is replaced with chlorine. The resulting compound (compound 7) is subjected to a reaction to remove the phenylacetyl side chain from the 7–position group, creating compound 8. From there, compound 9 is created when a phenylglycine side chain is added. Finally, the p-nitrobenzyl protecting group is removed from the 4–position, creating cefaclor. Thus, in the course of these four process steps, three chemical groups are removed and two are added.

Because of these structural differences, compound 6 and cefaclor are characterized by different biological properties. For example, in contrast to cefaclor, which has an exceptionally high antibiotic activity, compound 6 has no antibiotic activity. Further, unlike cefaclor, compound 6 cannot be taken orally. Oral activity is important because a drug that must be administered by injection requires a hospital visit or a doctor's appointment, but an oral antibiotic can be taken easily at home. This convenience not only makes oral antibiotics more desirable commercial products, but it lowers the costs associated with medical care.

Taken together, these molecular and biological differences highlight the obvious; compound 6 and cefaclor have fundamentally different utilities. Compound 6's only known utility is to serve as a multi-purpose intermediate that is useful in the synthesis of a variety of other cephem compounds, including chlorocephalosporins, halocephalosporins and methoxycephalosporins. Cefaclor's utility, by contrast, is that of a powerful antibiotic drug. Whereas cefaclor is a medicine, compound 6 is merely a raw material that can be used for making medicines. Cefaclor, then, is like a finished automobile, while compound 6 is the iron ore that must be refined and alloyed with carbon to make the steel to make the components of the automobile. While the latter has the potential to become one of a vast number of useful products, the former represents one possible realization of that potential.

In sum, there is little dispute that cefaclor has significantly different biological properties from compound 6. Because Opos' additional processing steps "change the physical or chemical properties of the product in a manner which changes the basic utility of the product," compound 6 has been materially changed.

*Lilly I*, 896 F.Supp. at 856–857 (citations omitted). The Federal Circuit described the structural differences between compound 6 and cefaclor similarly:

> Compound 6 differs from cefaclor in three respects. Although both compound 6 and cefaclor are based on the cephem nucleus, compound 6 has a hydroxy group at the 3–position on the cephem nucleus, para-nitrobenzyl carboxylate ester at the 4–position, and a phenylacetyl group at the 7–position. Cefaclor has different groups at each of those positions: it has chlorine atom at the 3–position, a free carboxyl group at the 4–position, and a phenylglycyl group at the 7–position. Each of those differences between compound 6 and cefaclor contributes to the effectiveness of cefaclor as an orally administered antibiotic drug. The free carboxyl group at the 4–position is believed important for antibacterial activity; the chlorine increases cefaclor's antibiotic potency; and the phenylglycyl group enables cefaclor to be effective when taken orally.
>
> To produce cefaclor from compound 6 requires four distinct steps. First, the hydroxy group is removed from the 3–position and is replaced by a chlorine atom, which results in the creation of "compound 7." Second, compound 7 is subjected to a reaction that removes the phenylacetyl group at the 7–position, which results in the creation of "compound 8." Third, a phenylglycyl group is added at the 7–position, which results in the creation of "compound 9." Fourth, the para-nitrobenzyl carboxylate ester is removed from the 4–position, which results in the creation of cefaclor.

*Lilly II*, 82 F.3d at 1570.

The Federal Circuit's opinion in *Lilly II* primarily dealt with the correct interpretation of the meaning of "material change" in § 271(g), examining the statutory language and legislative history for guidance and concluding, "In the chemical context, a 'material' change in a compound is most naturally viewed as a significant change in the compound's structure and properties." *Lilly II*, 82 F.3d at 1573. The appellate court reviewed the chemical structure and properties of compound 6 and cefaclor and found that there were significant differences that constitute a material change for purposes of the statute.

> [W]e share the district court's view that a change in chemical structure and properties as significant as the change between compound 6 and cefaclor cannot lightly be dismissed as immaterial. Although compound 6 and cefaclor share the basic cephem nucleus, which is the ultimate source of the antibiotic potential of all cephalosporins, the cephem nucleus is common to thousands of compounds, many of which have antibiotic activity, and many of which are dramatically different from others within the cephem family. Beyond the cephem nucleus that they have in common, compound 6 and cefaclor are different in four important structural respects, corresponding to the four discrete chemical steps between the two compounds. While the addition or removal of a protective group, standing alone, might not be sufficient to constitute a "material change" between two compounds (even though it could dramatically affect certain of their properties), the conversion process between compound 6 and cefaclor involves considerably more than the removal of a protective group.

*Lilly II*, 82 F.3d at 1573. The Federal Circuit determined:

> The chemical properties of the two compounds are completely different, the "basic utility" of the products is different, and the chemical structure of the two products is significantly different. The changes between compound 6 and cefaclor go far beyond … minor changes … such as the conversion to a salt, base, acid, hydrate or ester, or the removal of a protective group. . . .
>
> The chemical and biological properties of compound 6 are plainly different from those of cefaclor, and the utility of the two compounds, as that term is conventionally used, is quite different. Cefac-

lor is a powerful oral antibiotic, with a set of chemical and biological properties that give it great utility in that regard; compound 6 has no such properties, and it has no significant utility as an antibiotic. Moreover, the premise of Lilly's argument—that compound 6 has "utility" only as an intermediate in the preparation of cefaclor—is flawed. As the district court noted, compound 6 can be used to produce a variety of cephalosporin antibiotics, of which cefaclor is only one. While Lilly claims that cefaclor was the only derivative of compound 6 that was on the commercial market in the United States at the time of the district court's decision in this case, other cephalosporin antibiotics that are producible from compound 6 were on sale in other countries, and proceedings were pending to obtain authorization to market at least one of those antibiotics in this country.

*Lilly II*, 82 F.3d at 1577.

Lilly contends that the trial court and appellate court's previous opinions on the issue of whether compound 6 is materially changed when converted into cefaclor were based upon the assumption that compound 6 has no antibiotic activity and that the results of Lilly's experiments now reveal that compound 6 does have antibiotic properties and that fact thus undermines the courts' prior findings. In addition, Lilly argues that the structural differences between the compounds that we and the Federal Circuit identified are insignificant because compound 6 has antibiotic activity and thus the structural differences do not impact the biological properties of the substances as much as the courts believed previously. Our analysis of these issues will begin with an examination of the testing Lilly conducted on compound 6 to measure its antibiotic activity and then we will assess the impact of compound 6's antibiotic activity on the material change issue.

Lilly scientists conducted multi-phase *in vitro* and *in vivo* testing to determine the antibiotic activity of compound 6. In the *in vitro* testing, compound 6 was added to samples of bacteria culture to determine the Minimal Inhibitory Concentration, which measures the minimum concentration at which a compound is found to inhibit the growth of bacteria. The scientists tested compound 6 against *Streptococcus pneumoniae* D39 and *Streptococcus pyogenes* C203 bacterial strains at a concentration of 2500 (micro) g/ml diluted through 0.0006 (micro)g/ml. A powerful antibiotic, Loracarbef, was used as a control at a concentration range of 128 (micro) g/ml diluted twofold through 0.125 (micro) g/ml. The scientists concluded that compound 6 appeared to inhibit bacterial growth. In a second *in vitro* test, Lilly scientists used spectrophotometer technology to measure the short-term antibacterial effect of compound 6 on bacterial growth, using *Bacillus subtilis* X12 as the test bacterial strain. Compound 6 was prepared at a concentration of 10 mg/ml diluted twofold through 10 (micro) g/ml in dimethyl sulfoxide. In this test, the growth curves of the bacterial strains to which compound 6 was applied showed less than half the maximum absorbance of the control curves, from which results the scientists concluded that compound 6 inhibited the growth rate of the bacterial strains for the duration of the test. The scientists claim that "these tests confirm that Compound 6 ... demonstrate[s] meaningful *in vitro* antibiotic activity." Parr Decl. ¶ 19.

The *in vivo* testing evaluated the antibiotic efficacy of compound 6 against *Streptococcus pneumoniae* D39 in animal model. In the first experiment, ten mice were divided into two groups of five. Both groups received a 0.5 ml inoculation of the bacterial strain at a concentration of 1000 cells/ml and the treatment group received a 0.4 ml inoculation of 10 mg/ml of compound 6 at a concentration of 100 mg/kg at the time of infection and again four hours later. The scientists measured the number of surviving animals in each group at least every two hours for 31 hours after infection. The scientists concluded that the test results showed that the dose of compound 6 extended the survival time of

the treatment group significantly. In the second experiment, the scientists sought to determine whether survival time was dependent on the size of the dose of the antibacterial agent. The bacterial strain was prepared as in experiment 1. Fifty mice were divided into five groups of ten, and each group received a 0.5 ml inoculation of 1000 cells/ml of the bacterial strain and the four treatment groups received doses of 0.4 ml of compound 6 at the time of infections and again four hours later. Group 1 received nothing, group 2 received a dose of 10% dimethyl sulfoxide, group 3 received 300 mg/kg of compound 6, group 4 received 100 mg/kg of compound 6 and group 5 received 50 mg/kg of compound 6. The test results showed that group 3, which received the largest dose of compound 6 (300 mg/kg), survived significantly longer than the control group 2, which received only dimethyl sulfoxide, and group 4, which received 100 mg/kg.[3] Experiment 3 used *Streptococcus pneumoniae* D39 at a concentration of 15 mg/ml. Thirty mice were divided into three groups of ten. Each group received a 0.5 ml inoculation of 1000 cells/ml of the bacterial strain, group 1 received nothing else, group 2 received two doses of 0.4 ml of 10% dimethyl sulfoxide at the time of infection and four hours later and group three received two doses of 0.4 ml of 300 mg/kg of compound 6 at the time of infection and four hours later. The treatment group that received the dose of compound 6 survived significantly longer than the vehicle group, group 2, and the infection control group, group 1.

The Lilly scientists concluded that the fact that compound 6 at the 300 mg/kg dose in the *in vivo* experiments increased the survival time of the treatment groups "demonstrates meaningful antibiotic activity in these compounds." Parr Decl. ¶ 28. Another scientist reviewed the laboratory work and results of the Lilly scientists and asserted that the doses used in the testing

were "commensurate with dosages of other antibiotics administered in clinical settings" and that "these tests are used extensively in scientific and clinical research to measure a compound's antibacterial activity and are considered to be reliable tests for determining antibiotic activity." Moellering Decl. ¶¶ 4–5. Dr. Moellering concluded, "Although other antibiotics such as cefaclor and Loracarbef demonstrate greater antibiotic activity, the results of each of these tests demonstrate, in my opinion, that Compound 6 . . . exhibits antibiotic activity." Moellering Decl. ¶ 6.

Lilly relies exclusively on these test results for the proposition that compound 6 is not materially changed when converted into cefaclor. Lilly contends that the trial court and appellate court's rulings were dependent on the stipulation that compound 6 exhibited no meaningful antibiotic activity whereas the test results now show otherwise. Lilly also asserts that the fact that compound 6 has antibiotic activity undermines the significance of the structural differences between compound 6 and cefaclor. While we acknowledge that Lilly's scientific testing demonstrates that compound 6 has some antibiotic effect, we do not find the presence of antibiotic activity in compound 6 sufficient to overcome the significant differences between compound and cefaclor's chemical structures and properties, as catalogued in our prior decision and the appellate court's affirmance. We recognize that the basic cephem nucleus that compound 6 and cefaclor share is the ultimate source of antibiotic activity, and thus the fact that both compounds exhibit such activity is not remarkable. As the Federal Circuit stated previously, thousands of compounds contain a cephem nucleus and many of these compounds exhibit antibiotic activity. *See Lilly II*, 82 F.3d at 1573. However, the fact that compound 6 has been shown to exhibit antibiotic activity does not eliminate the signifi-

---

3. Data for the infection group, group 1, was not included in the test results, though we assume that all of the mice died early in the test and thus did not provide meaningful data. Group 5, which received only 50 mg/kg of compound 6, did not survive longer than the vehicle group, group 2, but appeared to perform at a similar level.

cant structural differences between the two compounds or the fact that cefaclor is an unusually effective, orally-administered antibiotic, while compound 6 appears to be used exclusively as an intermediate. Even Lilly's expert, Dr. Moellering, acknowledged that cefaclor is a more powerful antibiotic than compound 6.[4]

Lilly argues additionally, "The results of this latest testing have also shown that the modifications to alter Compound 6 to cefaclor are also not as substantial as suggested by the Federal Circuit. The free carboxyl group at the 4–position has now been irrefutably shown to not be essential for antibiotic activity. The phenylglycine 7–position side chain is also not critical for antibiotic activity or bioavailability. In short, the differences between Compound 6 and cefaclor are not significant, either structurally or functionally.... Thus, the new factual evidence demonstrates that Compound 6 has antibiotic activity and is bioavailable. It also has the same basic utility as cefaclor. The evidence thus also demonstrates that the structural change [sic] from Compound 6 to cefaclor are not substantial, and do not give rise to a 'material change.'" Lilly Resp.Br. At 8–9. We agree that the Federal Circuit did opine that "[t]he free carboxyl group at the 4–position is believed important for antibacterial activity; the chlorine increases cefaclor's antibiotic potency; and the phenylglycyl group enables cefaclor to be effective when taken orally." *Lilly II*, 82 F.3d at 1570. At best, Lilly's test results cast some doubt on the Federal Circuit's assertion that the free carboxyl group is important for antibacterial activity. We note, however, that the Federal Circuit did not say this step was crucial or necessary for such activity, and this step may be important for increasing antibiotic activity and even if not, there are other structural differences that Lilly cannot avoid. While

Lilly argues that the phenylglycyl group is not required for antibiotic activity, it is clear that the Federal Circuit never contended that it was; the appellate court linked this step to the ability of the drug to be administered orally, an important and valuable property distinct from antibiotic activity, which Lilly does not contest. Also, Lilly has not challenged the significance of the chlorine step, which the Federal Circuit found important for increasing the efficacy of the antibiotic effect of the drug. Considering the significant structural differences between compound 6 and cefaclor and the complex processing steps required to convert compound 6 into cefaclor as well as the fact that cefaclor undeniably is far superior to compound 6 in its antibiotic efficacy and its ability to be used and administered as a drug, we conclude that there is no genuine dispute of material fact that compound 6 is materially changed when converted into cefaclor.

■ Lilly argues that, even if the Court finds that compound 6 is materially changed when converted into cefaclor, there is another test that is set forth in the legislative history which allows a finding of infringement under § 271(g) even when a product is materially changed. Lilly directs the Court's attention to the Senate Committee Report for the Process Patent Amendments Act of 1988, which identified a second possible test for material change:

> If the only way to have arrived at Y is to have used the patented process at some step, e.g., producing X as an intermediate, Y is infringing.
>
> If there is more than one way to have arrived [at] Y, but the patented process is the only commercially viable way to have done so, Y is infringing.
>
> If there are commercially viable non-infringing processes to have arrived at

4. Defendants find it suspicious that the Lilly scientists did not use cefaclor as a control drug in order to provide a more direct comparison between compound 6 and cefaclor, and so argue that the significance of compound 6's antibiotic activity is difficult to compare with cefaclor's for purposes of the material change issue. We do not opine on this issue or give it any weight in our analysis but admit to some curiosity at this apparent lapse as well.

X, the connection between the patented process for producing chemical X and the ultimate product, chemical Y is broken, and Y would be a non-infringing product having satisfied both phases of the test.

S.Rep. No. 83, 100th Cong., 1st Sess. 51 (1987). The House Committee report similarly stated, "[A] product will be considered made by the patented process, regardless of any subsequent changes, if it would not be possible or commercially viable to make that product but for the use of the patented process." H.R.Rep. No. 60, 100th Cong., 1st Sess. 13–14 (1987). The conference report for the bill discussed the "material change" issue only briefly but reiterated the test set forth in the Senate and House reports. *See* H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 1087 (1988).

In *Lilly II*, the Federal Circuit did not decide whether this legislative history should be accorded equal weight with the statutory language relating to "material change" under § 271(g), finding that "even if the explanatory language from the 1987 House report were accorded equal status with the language of the statute itself, the explanatory language would not require that section 271(g) be read to reach the defendants' conduct in this case" because Lilly had conceded that it was possible and commercially feasible to make cefaclor by a process other than the patented process at issue in this litigation. *Lilly II*, 82 F.3d at 1575–1576. The Federal Circuit continued later, "[B]ecause there is at least one known commercial method for making cefaclor that does not use the patented process, the language in the conference report on the Process Patent Amendments Act does not help Lilly." *Lilly II*, 82 F.3d at 1578. However, Lilly asserts that the Federal Circuit did not consider the fact that the other available process was covered by Lilly patents and so not in the public domain, and Lilly contends that an alternative method covered by a patent is not a commercially viable alternative to the patented process at issue.

Defendants argue that the explanatory language in the legislative history is "de-cidedly a secondary source" to the statutory language itself. Defs.Rep.Br. at 13. Defendants rely on the fact that the Federal Circuit seemed hesitant to rely upon the explanatory language in the legislative history for the meaning of "material change," particularly the proposed second test involving the existence of a commercially viable alternative to the patented process. Defendants note that the appellate court observed that the legislative history does not provide "a conclusive answer to the question of how the 'materially changed' clause should be construed in general, and how it should be applied to the facts of this case in particular." *Lilly II*, 82 F.3d at 1578. Thus, Defendants contend that the Federal Circuit "reject[ed] the legislative history as interpretive authority." Defs. Rep.Br. at 13.

Defendants argue that the appellate court also "explicitly rejected a Lilly argument that was analogous to the contention raised here." Defs. Rep.Br. at 13. Lilly previously argued that there was no material change between compound 6 and cefaclor because compound 6 had no commercial use in the United States other than as an intermediate to producing cefaclor. The Federal Circuit did not find Lilly's argument persuasive, contending that "the language of the statute refers to changes in the product" and that "[t]he reference to a 'changed' product is very hard to square with Lilly's proposed test, which turns on the quite different question of whether the use or sale of the imported item impairs the economic value of the process patent." *Lilly II*, 82 F.3d at 1572. The court concluded that Lilly's proposed construction "is asking the statutory language to do too much work." *Id.* at 1573. Defendants also assert that, even if the Court adopts Lilly's interpretation and determines that an alternative process is not commercially viable if it is subject to patent, there are other commercially viable methods to produce cefaclor than the patented process at issue and Lilly's patented method and so Lilly's argument is unavailing ultimately.

We find it unnecessary to reach the issue of whether there are alternative methods to the Shionogi process and the Lilly patent process because we are not persuaded by Lilly's proposed interpretation of the "material change" clause in § 271(g). First, we note that the Federal Circuit implicitly decided this issue in its opinion. The Federal Circuit, in finding that Defendants satisfied even this second possible test for material change, relied upon the fact that Lilly conceded there was at least one commercially viable method other than the Shionogi process to produce cefaclor, and the method stipulated to by Lilly was in fact Lilly's own patented process that Lilly now presents. Thus, the Federal Circuit likely knew that the alternative method was subject to a patent, a patent not owned by Defendants and one that had not expired, yet the Federal Circuit did not find this fact critical or useful in its discussion of the issue and thus implicitly found that an alternative method protected by another process patent can be a commercially viable process satisfying the second test for material change. Second, the Federal Circuit in its opinion conveyed its reluctance to follow the explanatory language from the House and stated, "The inserted language is not easy to interpret, in part because it purports to identify some products that can 'materially be changed' without being 'materially changed.'" *Lilly II*, 82 F.3d at 1575. The appellate court declined to reach the issue of whether such language was in fact authoritative and by its hesitancy indicated, without deciding outright, that it did not find the legislative history a primary source for interpretive guidance.

Third, even if we were to adopt the "commercially viable alternative" test articulated in the Senate and House reports, we do not find that the explanatory language requires nor necessarily supports such a restrictive reading as Lilly proposes. The "material change" exception to process patent infringement under § 271(g) applies when an intermediate product is significantly different from the end product in its chemical structure, properties and basic utility. The "possible or commercially viable alternative" test provides that even when there are significant differences between an intermediate and end product, the infringing product is to be considered made by the patented process for purposes of § 271(g) infringement when the only way or the only "commercially viable" way to produce the end product from the intermediate is through the patented process.

While we recognize the appeal of Lilly's argument that a process which is subject to someone else's patent is not commercially viable because one would have to infringe the other patent in order to carry out the method, we do not find that this is the only or even most reasonable interpretation of what the Senate and House meant by "commercially viable" in the explanatory language. The focus of the material change clause is on the end product at issue and not the accused infringer's conduct. The "commercially viable" test is concerned with the connection between the intermediate and end product, not necessarily the behavior of the accused infringer. It is important to remember that the accused infringer in this case (and in any case involving the material change exception) actually uses the patented process, not any alternative process, and the test articulated in the legislative history ignores such literal infringement and only asks whether there are other possible and commercially feasible methods to produce the end product at issue. Further, we must state the obvious, that the explanatory language nowhere mentions the fact that an alternative method is subject to a patent as a barrier to commercial viability, nor even provides meaningful guidance as to what is meant by "commercially viable." Thus, we hesitate to accept Lilly's interpretation without stronger language in the statute or legislative history supporting it.

Lilly argues, "The applicable legislative history and case law make clear that for the existence of other 'commercially viable' processes to be relevant under § 271(g),

these processes must also be non-infringing. As noted by the Senate report, there must be 'commercially viable *non-infringing* processes to have arrived at' the final product to find no infringement." Lilly Resp.Br. at 20–21 (citation omitted). Lilly contends that the word "non-infringing" in this passage somehow implicates broader patent infringement at large and is not restricted to infringement of the patent at issue. However, in using the word "non-infringing," the Senate report clearly refers only to infringement of the patented process being litigated and so Lilly's argument finds no support there. In fact, the previous passage of the same Senate report provides support for the argument that the legislature considered the fact that an alternative process was covered by a patent to be irrelevant to the issue of commercial viability. The Senate report stated, "If there is more than one way to have arrived [at] Y, but the patented process is the only commercially viable way to have done so, Y is infringing." S.Rep. No. 83, 100th Cong., 1st Sess. 51 (1987). The Senate report describes the patented process as commercially viable, which provides evidence that in this context, the legislature considered "patented" and "commercially viable" to be two different, unrelated things and that the existence of a patent does not impact commercial viability. Under the test articulated by the Senate report, the reason the accused infringer cannot use the patented process is because the process is protected by the patent at issue, not because it is not commercially viable. This language indicates that the legislature did not consider the fact that an alternative method was protected by another process patent as a bar to commercial viability, but that it was concerned with whether it was possible and feasible to use other methods to make the end product besides the patented process. We do not consider this language dispositive but find it instructive.

Lilly also seizes on certain language in the House report, which provided, "In judging the commercial viability, the courts shall use a flexible standard which is appropriate to the competitive circumstances." H.R.Rep. No. 60, 100th Cong., 1st Sess. 13–14 (1987) (quoted in *Lilly*, 82 F.3d at 1575). Lilly claims, "In this case, the 'competitive circumstances' include the fact that at least one unexpired patent owned by Lilly still protected elements of the Lilly process, so that the Lilly process was hardly a 'viable' alternative for Opos." Lilly Resp.Br. at 21. While we see the appeal of Lilly's argument, we do not find this language very helpful in determining commercial viability, and it does not appear to speak at all to the issue of the significance of an alternative method that is patented.

In the same vein, Lilly directs the Court's attention to *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1548 (Fed. Cir.1995), which discusses the "absence of acceptable, non-infringing substitutes" test in the context of awarding damages for lost profits in patent infringement cases. The purpose of this test is to "tend[ ] to prove that the patentee would not have lost the sales to a non-infringing third party rather than to the infringer." *Id.* In *Rite–Hite,* the only substitute for the patented device was a device covered by another of the plaintiff's patents, and the court found that this did not constitute an acceptable, non-infringing substitute because the patented device was available only to the plaintiff's customers and thus the plaintiff could not have lost sales to a third party. *Id.* This case does not address the issue at hand because it involves the assessment of damages, not infringement, and is explicitly concerned with market realities, such as measuring concrete sales and identifying competing products as a means of determining lost profits caused by the infringer. In contrast, the "commercially viable alternative" test articulated in the legislative history of § 271(g) has a more abstract, theoretical focus, primarily concerned with what is possible and feasible rather than what is actually done and is ultimately directed evaluating the connection between the intermediate and end product at issue and

whether there is a material change, unrelated to the infringer's conduct. Thus, we do not find this case useful in addressing the issue before us, never mind controlling.

Practical reasons also compel a conclusion that forecloses incorporating the "commercially viable alternative" test into the material change inquiry under § 271(g) as Lilly desires. Accused infringers would have to identify alternative processes available for producing the end product, although they themselves do not use the alternative process. If the alternative process is subject to a patent, the accused infringer undoubtedly would engage in a validity enforceability challenge to the second process patent, inevitably bringing the owner of the second patent into the case, clouding and complicating the litigation dramatically, and with little purpose and perhaps without standing, for the accused infringer does not even use the alternative process whose patent it would be attacking. Also, the commercial viability test itself would be difficult to apply, for the guidance in the legislative history is vague, demanding a "flexible standard" but providing little concrete direction. The federal courts would have to determine what the scope of commercial viability would be, whether it must be viable for the particular accused infringer or simply for the largest, most successful manufacturer in the field, and what costs and profit/loss margins would permit a process to be determined commercially viable. While we have no doubt that, if required, our courts could rise to the challenge, it seems burdensome to impose such obligations on them when the statute does not articulate such a test and the legislators have not provided clearer guidance.

Finally, we confess our reluctance to give the legislative history equal weight to the statutory language, as Congress easily could have included language in the statute to the effect that the "material change" exception does not apply when there is no other possible or commercially viable alternative to the patented process, and we can only speculate as to why such language was not incorporated into the statute. It strikes us as particularly troublesome to follow the legislative history in this instance, when the explanatory language attempts to create an end-run around the "material change" exception set forth in § 271(g). Even if we attempted to follow the guidance of the legislature in its explanatory language, the legislature's statements are susceptible to more than one reasonable interpretation, and we cannot find that the language taken as a whole and in context with the statute necessarily supports the restrictive interpretation Lilly advocates. The test endorsed by Lilly requires too much from the statutory language and so we revert to the clear language of the statute, as enacted into law by Congress, which incorporates the provision regarding a material change by subsequent processes, which involves primarily physical changes to the product. If we were to choose to adopt the commercially viable alternative test set forth in the legislative history in its broader interpretation, without incorporating Lilly's requirement that the alternative method not be protected by a patent, Lilly still cannot succeed, as it concedes its patented process is a commercially viable alternative for producing cefaclor, and so we find Lilly's attempt to circumvent the material change clause is unavailing. As discussed above, we hold that there is no genuine issue of material fact that compound 6 is materially changed by subsequent processes when converted into cefaclor and thus *grant* Defendants' motion for partial summary judgment on this claim.

## CONCLUSION

Defendants move for partial summary judgment, contending that there is no genuine issue of material fact that compound 6 and cefaclor have significant differences that mandate a finding that compound 6 is "materially changed by subsequent processes" and so qualifies for the material change exception to patent infringement under § 271(g). Plaintiff Lilly argues that its testing on compound 6 reveals that compound 6 exhibits antibiotic activity and

thus compound 6 is not materially changed. Further, Lilly argues that there is a second test for material change under § 271(g), as articulated in the legislative history, which provides that even a product that is materially changed shall be considered made by the process patent at issue for infringement purposes if there is no other possible or commercially viable method for making the product. Lilly contends that the commercial viability test also requires that any alternative method be available in the public domain and not subject to patent and argues that because the only alternative method to the process patent in this case is subject to a Lilly patent, that Defendants cannot avoid infringement liability under the material change exception. For the reasons discussed in this opinion, we find that for purposes of § 271(g), compound 6 is "materially changed by subsequent processes" when converted into cefaclor and that the statute and the legislative history do not support Lilly's restrictive interpretation of the commercially viable alternative test. Accordingly, we conclude that Defendants are not liable for patent infringement under § 271(g) with respect to Lilly's Shionogi patents and *grant* Defendants' motion for partial summary judgment on this claim.

It is so ORDERED.